COWELL *v.* LAMMERS and others.

*Circuit Court, D. California.* August 11, 1884.,

MINERAL LAND—ISSUE OF PATENT EXCEPTING—INTRUSION BY CLAIMANT—COL-
LATERAL ATTACK ON PATENT.

On June 27, 1867, under the acts of congress of July 1, 1862, and July 2, 1864,
a patent, regular on its face, was issued for the N. E. ¼ of section 17, town-
ship 9, range 9 E., Mt. Diablo base and meridian, to the Central Pacific Rail-
road Company, to aid in the construction of its road. The patent expressly ex-
cepted all mineral lands, should any be found within the tract conveyed, but
there was nothing to indicate that any part of such land was mineral land. In
1873 the company conveyed the land to M., who entered into possession, oc-·
cupied, fenced, built upon, and cultivated the land until 1877, when he sold
it to C., who also went into possession and cultivated and used the land.
In 1881 L. entered upon a part of the land, against the will of C., and, claim-
ing that it was mineral land, took up a mining claim thereon. *Held,* that L.
could not, by this unlawful intrusion, initiate a right to a mining claim, and
that the patent was conclusive when collaterally called in question; following
*Atherton* v. *Fowler,* 96 U. S. 513, and *Steel* v. *Smelting Co.* 106 U. S. 447; S. C.
1 Sup. Ct. Rep. 389.

In Equity.

*D. Johnson* and *W. H. Beatty,* for complainant.

*George G. Blanchard,* for defendants.

SAWYER, J.   This is a suit in equity to enjoin the defendants from
committing a trespass in the nature of waste, in working a gold mine
on the N. E. ¼ of section 17, township 9 N., range 9 E., Mt. Diablo
base and meridian.   The quarter section is a part of a section des-
ignated by an odd number within the limits of the grant made by
congress to the Central Pacific Railroad Company, to aid in the con-
struction of said company's road, by the act of July 1, 1862, (12 St.
489,) as amended by the act of July 2, 1864, (13 St. 356.)   The road
having been completed in accordance with the provisions of said acts
of congress, a patent in the usual form was issued to the Central Pa-
cific Railroad Company on June 27, 1867.   The granting clause of
the patent is as follows:

"Now know ye, that the United States of America, in consideration of the
premises, and pursuant to the said acts of congress, have given and granted,
and by these presents do give and grant, unto the said Central Pacific Rail-
road Company of California, and to its assigns, *the tracts of land situated as
aforesaid and described in the foregoing, yet excluding and excepting from
the transfer, by these presents, 'all mineral lands,' should any such be found
to exist in the tracts described in the foregoing;* but this exception and ex-
clusion, according to the terms of the statute, shall not be construed to in-
clude coal and iron land.

"To have and to hold the said tracts, with the appurtenances, unto the said
Central Pacific Railroad Company of California, and to its assigns, forever,
*with the exclusion and exception* as aforesaid."

On March 13, 1873, the Central Pacific Railroad Company duly
conveyed the said quarter section, with other lands, to Daniel Mc-

Carty. McCarty went into the actual possession and occupation of the land, claiming title under the said United States patent and subsequent conveyance to himself. He fenced the lands embracing said quarter of section 17; erected a house, barn, and other out-buildings and improvements upon the said quarter section; cultivated portions of it in grain and other products used in his family, including his employes; burned lime on it for sale; and used the rest of it for hay and pasturage, having a large number of cattle, sheep, and hogs upon the land. He was thus in the actual possession and occupation of the land in question, having it under fence and in actual use from the time of his purchase, in 1873, till November 24, 1877, on which day he duly conveyed to the complainant, Cowell, who, upon receiving such conveyance, went into the actual possession and occupation of the said land, which, by and through his employes, he has ever since possessed, occupied, and used for purposes similar to those to which they were applied by his grantor, McCarty.

The defendant, by the permission of complainant, had erected a cabin on a portion of the lands of complainant other than that part upon which the trespass is alleged to have been committed, and outside said quarter of section 17, in which he had lived some years by complainant's permission, though without any lease; from time to time, as his services were required, working for complainant. In August, 1881, defendant, without the consent and against the will of complainant, entered upon the particular portion of the land now in question, assuming it to be public mineral land, prospected for a mine, and located a mining claim in pursuance, as he claims, of the rules and regulations of miners of the district, and of the Revised Statutes of the United States, upon the subject, upon what he now claims to be a gold-bearing quartz lode. He insists that a valuable gold mine has been found to exist at the point of the location claimed; that the act of congress did not grant "mineral lands" to the Central Pacific Railroad Company; that the patent, although covering the land in terms, excepts from its operation any lands that may be found to be mineral; that the lode in question did not pass to the railroad company either by the act of congress or the patent; and that it was, at the date of his location, public "mineral land," open to exploration and location by him. There is a good deal of testimony tending to show that there was a placer mine on the quarter section which had been exhausted and abandoned before the railroad grant attached; also that there had been some prospecting for quartz, and some found, but that it did not appear to be of sufficient value to pay for working, and that all work of the kind had also been abandoned before the rights of the railroad company attached; and that nothing had been afterwards done, except by the grantees in the patent, and that of very little consequence, to find, work, or develop a mine, till the entry and acts of defendant in 1881, complained of.

An application to the land-office to purchase the mine claimed to

have been located by defendant on the quarter section in question, made subsequently to the location of defendant, was rejected; on the ground that the land had already been regularly patented to the Central Pacific Railroad Company, at a time when there were no known valuable mines upon them, and that, notwithstanding the clause in the patent excluding mineral lands, the exclusion did not embrace mines that might be subsequently discovered and developed, and that, in issuing the patent to the railroad company, the jurisdiction and powers of the land-office had been exhausted. The commissioner of the general land-office, in affirming the decision of the local office in rejecting the application, says:

"Applicant claims that said Marble Valley quartz mine was discovered in July, 1881. He further claims, that, having complied with the provisions of section 2325, United States Revised Statutes, his application should have been received. Applicant's counsel argue that mineral lands did not pass to the railroad company by said patent issued under the acts of July 1, 1862, and July 2, 1864, and in support thereof refer to numerous decisions of courts and of this department. The only question arising here is, were these lands, at date of the patent to the railroad company, mineral, so that they should have been excluded from such patent? If so, then the patenting was an error of this office, or fraud was practiced by the railroad company. If not, then the title to the lands vested at date of the patent in the railroad company, and this office has no further jurisdiction in the premises. It is, therefore, plain that the decisions cited by the applicant's counsel do not apply to the case in hand. Said township was surveyed in 1866, and section lines were run. This was at a date when subdivisional lines of townships were not run in the survey of *mineral lands.* Provision for extending the public surveys over all the mineral lands was not made until the act of July 9, 1870. The fact of the survey of said section 17 in 1866, and that the plat of the survey of the township or the field-notes fail to show section 17 to contain 'valuable mineral deposits,' make a *prima facie* case in favor of the agricultural character of the section. It is not alleged, nor does it appear anywhere in the case, that any valuable mineral was discovered on section seventeen prior to the issuing of the patent.

"Under the grant to the state of California of sections sixteen and thirty-six for school purposes, the title vests in the state upon survey, if subsequent to the act, if the lands were not known to be mineral at that date. Sick. Min. Dec. 246. 'All mineral deposits discovered upon lands after United States patent therefor has issued to a party claiming under the laws regulating the disposal of agricultural lands, pass with the patent, and this office has no further jurisdiction in the premises.' Copp, U. S. Min. Lands, 121. This is an established principle recognized by this office, and applying to railroad companies claiming agricultural lands, as well as to any other party claiming under the laws regulating the disposal of agricultural lands. The excepting clause in the patent to the railroad company, excluding all mineral lands, other than coal and iron lands, from the transfer, *is construed to mean lands known to contain valuable minerals prior to the issuing of the patent. Subsequent discoveries would not affect the title of the company to the lands;* it would be entitled to the lands thus discovered. The patent in this case appears to have been regularly issued, and no error in this office in issuing the same, or fraud on the part of the railroad company, is alleged or claimed. * * * The title to the lands applied for is vested in the railroad company, under its said patent dated June 27, 1867, and the land is not subject to further disposal by the United States."

The complainant insists that, in view of the indisputable facts appearing in the case, the defendant is not in a position which entitles him, in this proceeding, to collaterally assail the validity of his title under the patent for two reasons; and, if I rightly comprehend the decisions of the supreme court upon similar questions, he is clearly right in this position. In *Atherton* v. *Fowler* the supreme court distinctly held that no right of pre-emption can be established by a settlement and improvement on a tract of land conceded to be public, where the pre-emption claimant intruded upon the actual possession of another, who, having no other valid title than possession, had already settled upon, inclosed, and improved the tract; that such an intrusion is but a naked, unlawful trespass, and cannot initiate a right of pre-emption. 96 U. S. 513. This decision was affirmed in *Hosmer* v. *Wallace*, 97 U. S. 579, and *Quinby* v. *Conlan*, 104 U. S. 421. In the latter case the court says:

"A settlement cannot be made upon public land *already occupied;* as against existing occupants, the settlement of another is ineffectual to establish a pre-emption right. Such is the purport of our decisions in *Atherton* v. *Fowler*, 96 U. S. 513, and *Hosmer* v. *Wallace*, 97 U. S. 575." 104 U. S. 423.

The laws no more authorize a trespass upon the actual possession and occupation of another, for the purpose of initiating a pre-emption right to take up and acquire under the statutes the title to a piece of mineral land, than to initiate an ordinary pre-emption right to a tract of agricultural land. The law does not encourage or permit, for any purpose, unlawful intrusions and trespasses upon the actual possession and occupation of another. To permit a right or confer authority to thus initiate a title to the public land, would be to encourage strife, breaches of the peace, and violence of such a character as to greatly disturb the public tranquillity. We are, unfortunately, not without painful examples of this kind in this state. Actual possession and occupation of lands in good faith, public or otherwise, have always, as against naked trespassers, been regarded as evidence of title, and fully protected by the courts of this state from its first settlement. In this case the defendant intruded upon the actual possession and occupation of the complainant, prospected for and located a supposed mine upon lands which had been inclosed with a substantial fence, and in the actual continuous possession, occupation, and use of the complainant and his immediate grantor for eight years, claiming title under a patent of the United States, regularly issued 14 years before. He is a mere stranger and trespasser upon the actual possession and occupation of the complainant, without any right recognized by the law of the land, and is not in a position to assail the complainant's title. If this is not the rule established by the decisions of the supreme court, then I am unable to comprehend their import. See, also, *Doll* v. *Meador*, 16 Cal. 320 *et seq.*

The patent is entirely regular and valid upon its face, as well as

when compared with the record in the land-office. If defeated, it must be upon parol evidence of matters *dehors* the patent and record, developed subsequently to the issue of the patent. To permit every intruder, upon his own notions of propriety, to collaterally assail a patent, regularly issued, on the grounds and under the circumstances disclosed in this case, would be intolerable. If any one was injured by the issue of complainant's patent for lands, since ascertained by exploration to be mineral lands, and for that reason not intended to be embraced in the congressional grant, it was the United States, not the defendant. No vested right of his was invaded or affected by the issue of the patent, he having at that time acquired no interest. He had no equity then, and he has none now, that entitles him to litigate the title of complainant derived from his patent, and actual possession thereunder. His present equity rests alone upon a trespass committed upon the actual possession of complainant.

I also think it clear that the defendant is not in a position to collaterally assail complainant's title resting upon the patent, under the rule established by the supreme court in *Steel* v. *Smelting Co.* 106 U. S. 447; S. C. 1 Sup. Ct. Rep. 389; *Smelting Co.* v. *Kemp*, 104 U. S. 640–647, and other cases cited in those cases. It is sought to distinguish this case from the smelting company cases cited, on the ground of the clause in the patent now in question, "yet excluding and excepting from the transfer of these presents ' all mineral lands,' *should any be found* to exist in the tracts described in the foregoing. * * * To have and to hold * * * with the exclusion and exception aforesaid." In my judgment, the insertion of this clause in the patent issued in no respect affects the rule as established by the supreme court in those cases, or its applicability to this case. The act granting to the railroad company "the alternate sections of the public lands designated by odd numbers," provided "that all mineral lands shall be excepted from the operation of this act;" that is to say, are not included in the legislative grant. 12 St. p. 492, § 3. The act itself is a present grant, and makes the exception. So the act to extend to California the right of pre-emption to unsurveyed public lands, in like manner provided "that the provisions of this section shall not be held to authorize pre-emption and settlement of mineral lands, which are hereby exempted from the provisions of this act," (Id. p. 410, § 7;) and by section 2258, Rev. St., mineral lands are also reserved from sale. In all these cases the act of congress itself, in like terms, excludes mineral lands. In neither case does it provide that any clause excepting mineral lands should be inserted in the patent. Yet the clause, for some reason, is inserted in the railroad grants, while it is omitted in pre-emption and other patents, so far as such patents have come under my observation. Section 4 of the act granting lands to the railroad company provides that upon the certificate of the commissioner provided for, that a

prescribed number of miles of road has been completed in accordance with the provisions of the act, "patents shall issue conveying the right and title to said lands [the alternate sections designated by odd numbers] to said company on each side of the road, as far as the same is completed, to the amount aforesaid; and patents shall, in like manner, issue as each forty miles of said road and telegraph line are completed." There is no express authority in the statute to issue a patent covering known mineral lands at all, and no more authority to insert a clause in a patent issued, excepting or excluding therefrom, generally and indefinitely, without describing them so as to identify the exceptions made by the patent, "mineral lands," should any be found to exist in the tracts described. There is just as little authority for one as the other; as little authority for inserting the clause of exclusion, as for issuing any patent at all embracing mineral lands. Under the statute, it is as clearly the duty of the officers authorized to issue patents to the railroad companies to ascertain whether the lands patented are embraced in the congressional grant and patentable, or are mineral lands and not patentable, as it is in the case of a pre-emption, homestead, or other entry and sale of public lands, to ascertain the facts authorizing the issue of the patent.

The act of congress, as long ago as 1796, provided that "every surveyor shall note in his field-book the true situations of *all mines,* salt-licks, salt-springs, and mill-seats which shall come to his knowledge. * * * These field-books shall be returned to the surveyor general, who shall thereupon cause a description of the whole lands surveyed to be made out, and transmitted *to the officers who may superintend the sales.*" 1 St. p. 466, § 2. The object, doubtless, is to enable the officers in charge to determine whether the lands are patentable or not. This provision has been in force ever since, and it was carried into the Revised Statutes, (section 2395.) So, also, the mineral lands, at the date of the survey of these lands, were not authorized to be surveyed by running the section lines. Thus the government has provided means to enable the land-office to determine the character of the lands, and whether or not they are of the character granted by the acts, or authorized to be sold or otherwise disposed of. No authority is given to issue patents in any of these cases to mineral lands excepted in the acts of congress, and this fact necessarily involves the duty to determine whether lands for which patents are sought are mineral or not, and it is presumed that that duty was duly performed. In this case, the evidence shows that there was nothing in the records of the land-office to indicate that the lands in question were mineral; and the fact that they had been surveyed at a time when mineral lands were not authorized to be surveyed, and the plats filed without designating the lands as mineral, is *prima facie* evidence that they were not mineral in character, and were included in the congressional grant and patentable as such. The question as to their patentability was, therefore, determined on

the surveys, records, and evidence. And the patent makes out, at least, a *prima facie* case of title in complainant.

The issue of the patent to the Central Pacific Railroad Company, then, notwithstanding the unauthorized, general, and indefinite clause of exception and exclusion "of mineral lands, should any be found to exist in the tracts described," now claimed by defendant to leave the facts open for contest, is just as clearly a determination by the officers of the land department that the lands described in the patent are not mineral, and are a part of the lands granted by the act, as in the case of a patent issued to a pre-emption homestead claimant, or other purchaser, under acts of congress having similar exceptions, without any similar clause of exception and exclusion inserted in the patent. The lands are either patentable under the act or they are not. If patentable, the issue of a patent is authorized. If not patentable, it is unauthorized, and the issue of a patent is, clearly, as conclusive evidence of the determination of the fact of patentability, upon a collateral attack, in the one case as in the other. Suppose it should afterwards turn out that all is mineral land. The exception would be as broad as the grant, and be void as an exception. Is it any the less so, in this class of cases, as to a part? No provision of the statute has been brought to my notice authorizing any distinction in these different classes of patents, or authorizing any vague or uncertain exception, leaving the question as to what is granted and what is not, open to contest upon parol evidence of matters *dehors* the patent subsequently developed and brought to light. The land department in this very case, as in cases of patents to pre-emptioners, homestead claimants, and other purchasers of the public lands, have acted, and I think correctly, upon the idea that patents to lands not known to be mineral lands at the time the patent issued, carry the title to all mines subsequently discovered in the lands, notwithstanding the reservation from sale of mineral lands in the acts of congress. By the words "mineral lands" must be understood lands known to be such, or which there is satisfactory reason to believe are such at the time of the grant or patent. And the United States courts which have had occasion to act upon this subject, so far as I am aware, have adopted that idea. *P. C. M. & M. Co.* v. *Spargo,* 8 Sawy. 645; S. C. 16 FED. REP. 348. There must be some point of time when the character of the land must be finally determined, and, for the interest of all concerned, there can be no better point to determine this question than at the time of issuing the patent. The supreme court has not yet had occasion to decide the point as to the effect on a patent of a discovery of a valuable mine in lands subsequent to the issue of a patent. Any other construction would be disastrous in the extreme to the holders of lands in California under United States patents. If land which a party has actually occupied, possessed, and peaceably enjoyed for a long series of years, claiming title under a patent of the United States 15

years old, can be entered upon and prospected for a mine by any trespasser who chooses to do so, and, a mine being found, the mine can be located, and taken out of the patent on the vague and uncertain exception in the patent in question, it can be done fifty or a hundred years hence, and the patent, instead of being a muniment of title upon which the patentee or his grantees can rest in security, would be but a delusion and a snare. Congress could never have contemplated such a construction and execution of the acts in question. In much the larger portion of the mining regions of the state, the placer mines were worked out, exhausted of their mineral, and utterly abandoned for mining purposes years ago, and since their exhaustion and abandonment they have been taken up by and patented to pre-emptioners, homestead claimants, railroad companies, and other purchasers, as agricultural lands, and have been fenced, cultivated, grazed, planted with orchards and vineyards, built upon, occupied, and enjoyed by a large, thriving, prosperous, contented, and happy population. Those who were once miners, after working out their mines, have themselves purchased as agricultural lands the lands which they had thus exhausted of their mineral wealth, and have now become agriculturists, farmers, stock-raisers, fruit and wine producers, etc. The very township in which the land in question is situated, and of which it forms a part, affords a striking illustration of the facts stated. According to the record of the land-office in evidence, said township 9, which is situated in the mining region, contains 22,970.76 acres of land, of which there have been sold and patented, under pre-emption and homestead laws, 8,957.77 acres; granted and patented to the railroad company, 9,843.29 acres; applied for under homestead laws and not yet patented, 1,043.13; sold under the mining laws as placer mines, *110 acres;* as quartz mines, *.93 of an acre;* and as marble mines, *13.47 acres.* Are the owners of all these lands, thus sold, to be for all time liable to have their possession, held under patents upon their face regularly issued, intruded upon by any trespasser who chooses to prospect his orchard or vineyard or pasture for a mine, and when a mine shall be found have it taken from him by the intruder under the claim that the patent is void on the grounds insisted upon in this case, that the land was not subject to sale in the case of purchasers, or was not granted in the case of the railroad company? If such be the case, there is certainly a serious defect in the laws, or in their execution. I am unable to discover or believe that such a position is sanctioned by the laws, or by the decisions of the supreme court. The exception of mineral lands from the grant in the act of congress is explicit. There is no express authority, no provision at all, requiring or authorizing this exception to be repeated in the patent. Lands patentable under the grant, and no others, are authorized to be patented. If the exception in the patent is no broader in its signification than the statute, it adds nothing to and takes nothing from the effect of the statute

itself in this respect, or to the effect of the patent issued in pursuance of the statute. If it is broader than the statute, then it is wholly unauthorized by law, and as to the part which goes beyond the statute, at least, is utterly void. A patent upon its face should either grant or not grant. It must be seen from a construction of the language of the grant itself whether anything is granted or not, and, if anything be granted, what it is. There is no authority to issue a patent which, in effect, only says if the lands herein described hereafter turn out to be agricultural lands, then I grant them, but if they turn out to be mineral lands, then I do not grant them. Such a patent would be so uncertain that it would be impossible to determine, from the face of the patent, whether anything is granted or not. The most that can be said, then, is that the clause of exception and exclusion in the patent in no way affects the rights of the parties given by the statute, in no way enlarges or restricts those rights, and the same force and effect must be given to the patent on a collateral attack as would be given to it had the clause been omitted, as both classes of patents would depend upon and be controlled by the same or similar statutory provisions. We have seen, in the cases cited from the supreme court reports, that *patents* issued under the various acts of congress excepting and reserving mineral lands from sale or grant, in precisely similar language, but which omit the clause of exception and exclusion found in the patent in question, have always been held by the supreme court to be unassailable collaterally. The same rule must be held applicable to the patent in question and those like it.

If the foregoing views are correct, it would have been better if no distinction had been made between patents issued under different acts of congress having similar exceptions; better if no such exception had been inserted in the patent. The exception inserted in this class of patents, upon the view adopted, only affords a pretext for collaterally assailing its validity, thus inviting and stimulating litigation. Circumstances from the beginning, in this state, seem to have conspired to afford an infinite variety of pretexts, more or less plausible, for assailing all classes of patents to land issued by the United States, and on that ground to create a very general and widespread feeling of insecurity and distrust in regard to land titles. The sooner it comes to be a generally recognized principle that a United States patent, regular upon its face and upon the record, issued in the forms prescribed by the laws, means something,—that it is unassailable collaterally, or even with success directly, by parties having the proper *status*, except upon clear and indisputable grounds and evidence,—the sooner confidence in land titles will be re-established, and the better it will be for the good order, tranquillity, prosperity, and happiness of the people of California.

In my judgment, the defendant is not in a position, in this suit, to assail or question the title of the complainant resting upon his pat-

ent, and his possession under it, for the reasons stated on all the points discussed in the opinion. The view taken upon the points discussed renders it unnecessary to consider the evidence as to whether the land in dispute is in fact mineral land, or, if it is, whether its mineral character was, in fact, known at the date of the patent.

Let a decree be entered for complainant for a perpetual injunction, in pursuance of the prayer of the bill, with costs.