## FRANCOEUR v. NEWHOUSE.

*(Circuit Court, N. D. California.  December 9, 1889.)*

1. PUBLIC LANDS — GRANT TO CENTRAL PACIFIC RAILROAD COMPANY—GRANT IN PRÆ-
SENTI.
    The grant of lands to the Central Pacific Railroad Company to aid in the con-
struction of its road, under the act of congress of July 1, 1862, and the amenda-
tory act of 1864, is a grant *in præsenti*, which can only be defeated by the failure
to perform the conditions subsequent, and appropriate judicial proceedings to de-
clare a forfeiture.

2. SAME—EJECTMENT BEFORE PATENT ISSUES.
    The title which vests under the congressional grant, and the performance of the
prescribed conditions, is a legal title, upon which an action of ejectment may be
maintained before the patent issues.

3. SAME—OFFICE OF PATENT.
    The patent issued under the congressional grant is only a convenient instrument
of evidence that the conditions have been performed and the title vested.

4. SAME—FAILURE TO PAY EXPENSE OF SURVEY.
    The failure to pay the expense of surveying, under section 21 of the act of 1864,
only prevents the issue of the patent. It does not prevent the title attaching un-
der the congressional grant.

5. SAME—EXCEPTION OF MINERAL LANDS.
    The exception of mineral lands from the grant to the Central Pacific Railroad Com-
pany, only extends to lands known to be mineral, or, apparently mineral, at the time
when the grant attached; and a discovery of a gold mine in the lands after the title
has vested by full performance of the conditions, does not defeat the title.

6. SAME—UNAUTHORIZED EXCEPTION IN PATENT.
    An exception inserted in a patent, which is not authorized by the statute to be
inserted, is void.

7. SAME—PATENT FOR LANDS ALREADY GRANTED—COLLATERAL ATTACK.
    Where a patent is issued for land which has been before granted to other parties,
and there is no interest left in the government to grant, the interior department
acts without jurisdiction, there being nothing in the United States to grant, and the
patent so issued is void, and may be collaterally impeached.

8. SAME—RIGHTS OF TRESPASSERS.
    Where land has been granted to private parties, other parties have no right after-
wards to enter upon the land and prospect for gold.  No right can be initiated by a
trespass upon private lands.

*(Syllabus by the Court.)*

At Law.

This is an action to recover possession of lot 52 of section 13, town-
ship 17 N. of range 11 E. Mt. Diablo meridian.   The plaintiff claims
title by conveyance from the Central Pacific Railroad Company.   It is
alleged in the complaint that the land is part of an odd-numbered sec-
tion lying within the 10-mile limit of the grant made to the Central Pa-
cific Railroad Company, to aid in the construction of a railroad, by the
act of congress passed July 1, 1862, (12 St. 489;) that the said corpora-
tion filed its assent to said act, and a map designating the general route
of said railroad, with the secretary of the interior within two months
after the passage of the act; that on August 2, 1862, the secretary of
the interior caused all the lands within 15 miles of said route, including
the land in question, to be withdrawn from pre-emption, private entry,
and sale; that the line of said road was definitely fixed, said road fully
constructed and accepted by the president, from the western terminus, to

a point more than 25 miles east of the township in which said land is situated, prior to September 29, 1866; and the whole of said road was definitely located, constructed, accepted by the president, and in operation to the east line of the state prior to July 2, 1868; that in the year 1866 the secretary of the interior caused all the lands in said township 17 north to be surveyed, and on March 2, 1867, the United States surveyor general made return of the official plat of said survey, and filed the same in the general land-office at Washington, on June 2, 1867, and the same was soon after regularly filed in the local land-office at Marysville, that being the district in which said land was situated; "that by said survey the description of all lands in said township was ascertained, and the character thereof determined to be agricultural lands, and not mineral or swamp in character, nor covered by any governmental reservation; that the plats filed as aforesaid, so reported and showed the said lands; and that said determination, report, and showing have continually remained, and still remain, of full force and effect;" that said section 13, township 17, is within the limits of five miles of said railroad, along the line thereof, and, with other lands, was granted to said Central Pacific Railroad Company of California by said act of congress; that at the date of the passage of said act of congress, at the date when said line of said railroad was definitely fixed, and at the date when the said railroad was actually constructed through and beyond said township, all of said section 13 was returned as agricultural land, and no part of the same was known mineral land, or returned or denominated as mineral land, nor had any part of the same been sold, reserved, or otherwise disposed of by the United States, nor had any pre-emption or homestead claim attached to the same; nor was any part of said land within any exception from said grant; nor did the granting thereof to said company defeat or impair any pre-emption, homestead, or swamp, or other lawful claim to the same, or to any part thereof.

That during the year 1883 a vein or lode of quartz-bearing gold, in paying quantities was discovered within lot 53 of section 13, the premises in question; that on April 20, 1885, the Eagle Gold Mining Company filed in the proper office its application for a patent to said lot 53, from the United States, under the mining laws passed by congress; that on May 5, 1887, pursuant to said application, the land department issued to said Eagle Gold Mining Company a patent to said lot 53, as the Eagle Bird Quartz Mine. That said application was made and patent issued without authority of law, and said patent is void, and, that said defendant is in possession, claiming under said patent through mesne conveyances from said patentee.

That the Central Pacific Railroad Company has tendered to the treasury the amount of money required by the statute, and demanded a patent, but it has been refused, although all acts required by the law to entitle it to a patent have been fully performed, and the title to said premises has vested in it.

*A. L. Hart* and *Geo. H. Francoeur*, for plaintiff.

*Reinstein & Eisner* and *James M. Sewell*, for defendants.

Before SAWYER, Circuit Judge, and SABIN, J.

SAWYER, J., (*after stating the facts as above.*)   It has been so often decided that the grant to the railroad company under this, and similar acts, is a grant *in præsenti*, passing and vesting a present title, only to be defeated by a failure to perform the conditions subsequent, and suitable judicial proceedings on the part of the United States, to forfeit them, that it is only necessary to cite the authorities without further discussing the question.   *Railroad Co.* v. *Railroad Co.*, 97 U. S. 496; *Schulenberg* v. *Harriman*, 21 Wall. 44; *Van Wyck* v. *Knevals*, 106 U. S. 360, 1 Sup. Ct. Rep. 336.   "'There be and is hereby granted' are words of absolute donation, and import a grant *in præsenti*.   This court has held that they can have no other meaning."   *Railroad Co.* v. *U. S.*, 92 U. S. 741; *Wright* v. *Roseberry*, 121 U. S. 500, 7 Sup. Ct. Rep. 985; *Railroad Co.* v. *Orton*, and cases cited, 6 Sawy. 198; Mr. Justice FIELD went over the subject fully in *Denny* v. *Dodson*, 13 Sawy. ——, 32, Fed. Rep. 899, in which he held that not merely the equitable title, but the legal title to the land passed by the legislative grant *in præsenti*, in such sense that an action of ejectment could be maintained upon it—that the patent provided for, was not necessary to pass the title, but was only a convenient instrument of evidence, citing a passage from the opinion of the supreme court, in *Langdeau* v. *Hanes*, 21 Wall. 521, as follows:

"In the legislation of congress a patent has a double operation.   It is a conveyance by the government, when the government has any interest to convey, but, where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities respecting the claim, as justify its recognition, and confirmation.   The instrument is not the less efficacious as evidence of previously existing rights because it also embodies words of release or transfer from the government."   *Denny* v. *Dodson*, 32 Fed. Rep. 904.

The provision of section 21 of the act of 1864 requiring the railroad company to pay the expenses of surveys and conveyance, does not affect the question of the vesting of the title under the legislative grant.   It only applies to the issue of a convenient instrument of evidence.   But in this case the title had already vested and passed beyond the authority of congress, before the passage of the act of 1864, which could only amend the prior act so far as to effect its future operation as a law.

A title, therefore, vested by the grant, and performance of the conditions, upon which an action of ejectment can be maintained.

The next question is, did the land in question pass, by the grant of 1862 perfected in 1866–67 in which a gold mine was discovered in 1883, 21 years after the grant attached by the filing of a plat of the general route of the railroad, and the withdrawal of the lands in pursuance of the statute, by the secretary of the interior, and more than 17 years after the completion of the road, and its acceptance by the president, and more than 16 years after the final survey, and report of the lands, as agricultural, and not mineral?   The parties to this grant, both the United States, and the grantee, must be presumed to have contemplated a grant

in view of the condition of the lands as they were known, or appeared to be, at the time the grant took effect. In the exception of "mineral lands" from the grant, congress must have meant not only lands mineral, in fact, but, lands known to be mineral, or, at most, such as were, apparently, mineral, and, generally, recognized as such. Congress could not have contemplated that the discovery of a paying mine, 15 or 20 years after the making of the grant, and the performance of all the conditions by the grantee, required to perfect the title, and render it irrevocable, should vitiate the grant. If so, then such a discovery 50, or 100 years after, would effect the same result. In granting the public lands, congress must be presumed to deal with them in view of the conditions as they are known, or supposed to be, at the time. Exceptions must be presumed to refer to matters that are readily apparent upon inspection. Any others would be altogether too indefinite to be valid. The conditions constituting the exception ought, certainly, to be ascertainable at the time the grant takes effect, or they ought not to be operative; otherwise the greatest confusion and inconvenience, public and private, must, necessarily, result.

The grant should point out what is granted, in such certain terms, that the grantee may be able to ascertain by inspection, and know at the time the location is definitely fixed, and it becomes operative, what specific tracts of land are granted, and what are excepted from the grant. These lands soon after the grant, were conveyed, in trust, under authority of the law, as security for the bonds issued, out of the proceeds of which, the road was constructed; and the proceeds of these sales are devoted by the trustees to the redemption of the bonds. Is this security to be impaired, or destroyed, by taking from the operation of the grant all lands in which at any future time gold or other valuable metals may be discovered? If so, all of the lands may sooner or later revert to the United States, and these bondholders, and those who, in good faith have purchased the lands of the company without being aware of the mines secluded in their lower depths, will be largely injured.

These words "mineral lands," used in the act, must be construed in a practical sense—as practical men would use them in contracting about them—must be construed with reference to their present known, or at least, obviously apparent condition.

I had occasion to express my views in a general way upon this subject in *Cowell* v. *Lammers*, 10 Sawy. 246, 21 Fed. Rep. 206. In that case it is said, "by the words 'mineral lands' must be understood lands known to be such, or which there is a satisfactory reason to believe are such, at the time of the grant, or patent." In that case, it was not necessary to go behind the date of the patent, which was issued to the company *in accordance with, and in pursuance of the grant, and not to a trespasser in opposition to the grant, as in this instance.* Those who make or take subsequent grants must see that there is something to grant. It is not enough to know, that the lands contain minerals, at the *date of the issue of the patent,* in order to grant them as mineral lands. It must be known, also, that there has been no prior divestment of title. I am satisfied that the

lands ought not, only, to be mineral, in fact, but, also, to be known as mineral, or there should be satisfactory reason to believe them to be such, at the date when the grant takes effect, in order to fall within the exception of mineral lands, in such sense, as to defeat the grant. And this is, evidently, the view of the supreme court, as there is no case, so far as I am aware, wherein that court has sustained an exception, of "mineral lands," in these grants unless they were known to be mineral, at the time of the grant. This point is very fully considered by the court in *Coal Co.* v. *U. S.*, 123 U. S. 326, 327, 8 Sup. Ct. Rep. 131. Says the court in that case, quoting from a prior decision:

"We say ʻland *known at the time,* to be valuable for its minerals,' as there are vast tracts of public land in which minerals of different kinds are found, but not in such quantity as to justify expenditures in the effort to extract them. It is not to such lands, that the term ʻmineral,' in *the sense of the statute* is applicable. We, also, say lands *known at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land in which years afterwards rich deposits of mineral may be discovered.* It is quite possible that lands settled upon, as suitable, only, for agricultural purposes, entered by the settler, and patented by the government, under the pre-emption laws, may be found years after the patent has been issued, to contain valuable minerals. Indeed this has, often, happened. We, therefore, use the term ʻ*known to be valuable at the time of sale*' *to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued.*" 123 U. S. 327, 8 Sup. Ct. Rep. 141.

This was but affirming similar views before expressed in *Deffeback* v. *Hawke,* 115 U. S. 404, 6 Sup. Ct. Rep. 95. In this case, the supreme court also affirm the view of the circuit court expressed in *Cowell* v. *Lammers, supra,* that an exception inserted in a patent, in express terms, by the secretary of the interior, not required or authorized by the statutes, is void.

Now in this case, according to the allegations of the complaint, after the grant had been made, and all the conditions fully performed by the grantee, the road accepted by the president, and the title irrevocably vested in the grantee, and, before there was any authority at all to survey mineral lands, as in the case of *Cowell* v. *Lammers,* the township and section including the lands in question, were surveyed, as agricultural lands, and so returned and represented to the land-office; and they were so regarded until the discovery of gold-bearing quartz, many years afterward, in 1883, when a patent was refused the railroad company, and issued to defendant's grantor. This discovery, in our judgment, was too late. There was at the date of the legislative grant, and for many years afterwards, nothing appearing in the nature of a valid exception to take the premises in controversy out of the operation of the grant. The department, in issuing the patent to defendant's grantor, instead of to the railroad company, seems to have acted in view of the condition of things, as they appeared, after the discovery of the gold-bearing quartz, in 1883, and not as they appeared, and were known, at the time of the making

of the congressional grant; the performance of the conditions of the grant by the grantee; and the subsequent survey made by the government in 1866–67, as agricultural lands.

It is further objected, that the patent thus issued to defendant's grantor, cannot be, collaterally, attacked, in an action of ejectment—that it can only be impeached by a direct proceeding in equity to declare it void, or control whatever title passed by it for the benefit of the party equitably entitled. This, it appears to us, would have been the better course, and at first we were disposed to think it was the only course. But upon further consideration, and an examination of the authorities, we think the case does not fall within that rule. In recognizing the rule insisted upon in a proper case, the supreme court, in *Smelting Co.* v. *Kemp*, 104 U. S. 641, add:

"Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, *or had previously been disposed of,* or if congress had made no provision for their sale, or had reserved them, *the department would have no jurisdiction to transfer them,* and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would in that event be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, *and goes to the existence of a subject upon which it was competent to act.*"

And in *Wright* v. *Roseberry*, 121 U. S. 519, 7 Sup. Ct. Rep. 985, the supreme court quote, and approve the foregoing, and further quote and approve another passage, as follows:

"A patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale, *or dedicated to special purposes, or had been previously transferred to others.* In establishing any of these particulars, the judgment of the department upon matters properly before it is not assailed, nor is the regularity of its proceedings called into question; but its authority to act at all is denied, and shown never to have existed."

They cite other authorities to sustain this view. Now those observations cover the case. The point was, also, directly decided in *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228. These lands under the allegations of the complaint, "had previously been disposed of" by legislative grant, and the United States had no interest left to grant. There was no jurisdiction left to dispose of them to somebody else as there was nothing to dispose of. And the court says:

"A patent may be collaterally impeached in *any action,* and its operation as a conveyance defeated, by showing *that the department had no jurisdic-*

*tion to dispose of the lands,　*　*　*　or that they had been previously trans-ferred to others."*

That is this case. Had the department issued a prior patent to the railroad company, and then one to the defendant's grantor, there can be no doubt that it would be the duty of the court in this case to determine which carried the title. If the first patent was valid, there would be nothing upon which the second could operate. So in this case, if the congressional grant was valid, and operative, there was nothing upon which the patent to the defendant's grantor could operate, and it is competent for the court in this case to ascertain which grant took the land.

Upon the views expressed, the demurrer must be overruled, and it is so ordered, upon the usual terms.

Sabin, J., (*concurring*.) I fully concur in the decision just read, but I desire to add a word in confirmation of it, or rather in regard to a matter connected therewith, that has often arisen before the court, and which is very liable to arise in the future. In the judgment just rendered it is decided that the grant by congress, under discussion, was a grant *in præsenti*, and that upon compliance with the terms of the grant the title to the land vested in the railroad company. This matter has been so often before the court, and so often decided by this court, and the supreme court, that it is not worth while to mention it further. There seems in this matter, where the government has issued title to land, either to railroad companies or to the state, by way of its school lands, or to private parties, to be a misunderstanding on the part of many people that all these lands are still subject to exploration by outside parties for mines, or anything else, the same as though they were public lands of the United States. The act of congress which opens the public land to exploration for mines speaks only of public lands. Indeed, it is public land only that congress has authority to grant a license to go upon. I think, after the government has, as in this case, divested itself of the title to the land, that any man going upon the land to explore for mines, or anything else, is a mere trespasser. The lands are to that extent withdrawn from exploration for mines; and I am utterly at a loss to see how any one can assume that he can acquire a legal title to a mine upon my land, or on any one's land, the title of which has been divested from the government, or how he can assume to acquire any such title from any act of congress that I have any knowledge of. As I observed, these matters have incidentally come so often before the court for discussion that I think it worth while to call the attention of the profession to the fact that by the express terms of congress only public land is open for exploration for mineral. As said by the supreme court in the case of *Belk* v. *Meagher*, 104 U. S. 279, location confers no right of entry upon lands, unless the previous right to enter on that land to locate a mine, or for other purposes, pre-existed. Right of entry is the paramount thing. If a man has a right to enter upon the public land, or a right to enter upon my land, to explore for mines, then he may make a location; but, if he has not that right of entry in the first instance, then his location amounts to nothing, whatever

he may discover. I know of no law that gives any one a right to explore my land, or any companies' or corporations' land, for the purpose of making a location upon it. The supreme court has often held that no right of pre-emption or otherwise can be initiated by trespass.