NORTHERN PAC. R. CO. *v.* BARDEN *et al.*

*(Circuit Court, D. Montana.* June 12, 1891.)

1. RAILROAD GRANTS—EXCEPTIONS—MINERAL LANDS.
    The provision of Act Cong. July 2, 1864, (13 St. 365,) granting land to the Northern Pacific Railroad Company, "that all mineral lands be, and the same are hereby, excluded from the operation of this act," applied only to "known" mineral lands.
2. SAME.
    The lands granted being the odd-numbered sections within a certain distance of the road owned by the United States at the time when the road should be definitely fixed, and a plat thereof filed in the general land-office, to exclude land from the operation of the grant as mineral land it must have been known to be such at the time of such definite location and filing.

KNOWLES, J., dissenting.

At Law. On demurrer to complaint.

Demurrer to a complaint in an action to recover possession of portions of section 27, township 10 N., range 4 W., P. M. Montana. Plaintiff alleges its incorporation under the act of congress of July 2, 1864, (13 St. 365,) for the purpose of building the Northern Pacific Railroad; that by that act there was granted to plaintiff every alternate section of public land not mineral, designated by odd numbers to the amount of 20 sections per mile, on each side of such railroad line as said company might adopt through the territories of the United States, whenever, on the line thereof, the United States had full title, not reserved, sold or granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time when the line of said road should be definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office; also other provisions of the act; that plaintiff duly accepted the terms and conditions of said act in the mode prescribed by law, within two years after the passage of the act, to-wit: on December 24, 1864; that the *general* route of said road extending through the state of Montana, was duly fixed, on February 21, 1872; that the said lands in question in said section 27 are within the 40 miles of the line of said railroad as so fixed, and were on said February 21, 1872, public lands to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights; that at the date of said act, July 2, 1864, and the date of fixing said line of general route, to-wit: February 21, 1872, no part of said land in question was *known mineral land,* but said land was more valu-

able for grazing than for mining purposes, and that no part of said land was within any *exceptions* from said grant; that afterwards, on *July 6, 1882, plaintiff definitely fixed* the line of said railroad *extending opposite to and past said land, and filed a plat thereof,* in the office of the commissioner of the general land-office; and that said land is within 40 miles of said line of railroad as so *definitely* fixed; that thereafter, the plaintiff duly constructed said portion of said road and telegraph line over, and along the line of definite location so fixed, and upon reports of commissioners, as required by said act, the president of the United States duly accepted said railroad and telegraph line so constructed and completed; that at the date of so definitely locating said line of railroad and filing the plat thereof in the office of the commissioner of the general land-office, on July 6, 1882, the said land was *not known mineral land,* and was more valuable for grazing than mining purposes, and that said land was on said day public land to which the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights; that said lands were surveyed in 1868 and township plat filed in the proper land-office on September 9, 1868; that the character of said land was ascertained and determined, and reported and shown upon said plat to be agricultural and not mineral land, and that said determination, report and showing have continually remained and they still remain of full force and effect; that after the completion of said railroad aforesaid, the said plaintiff listed said lands with other lands as a portion of said grant, and thereafter on November, 1886, duly filed said list in the district land-office at Helena, and paid the receiver of said land-office the lawful fees for filing such list; and said register and receiver duly accepted and allowed said list; and certified the same to the commissioner of the general land-office; and said list has since remained and it is now of record in said general land-office, and no part of said fees has been returned or tendered to said plaintiff; that at the time of the acceptance, approval and allowance by said district land officers, and at all times prior thereto, no part of said land was known mineral land, or was of greater value for mining than for grazing or agricultural purposes, or town-site purposes, *or had any value for mining purposes whatever;* that during the year 1888 certain veins or lodes in place of rock in place bearing gold, silver and other precious metals were discovered in said land, and thereafter certain parties named, being citizens of the United States, without the consent and against the will of plaintiff, entered upon said land and made locations of said veins or lodes, to-wit: on June 20, 1888, the Vanderbilt Quartz Lode Mining Claim on lot 68, on August 10, 1888, the Four Jacks, N. Y. Central, and Hudson River Quartz Lode Mining Claim, number 72, 74, and 75, respectively; and on May 9, 1889, the Chauncey Depew Quartz Lode Mining Claim on lot number 73 of said lots, being within the said disputed premises; that said defendants are in possession of said lots 68, 72, 73, 74, and 75, claiming title under said locations through mesne conveyances from said locators, and they have been and now are extracting ore therefrom; and that although title has vested in said plaintiff, under said

act of congress, and the acts performed by it as alleged, and plaintiff has thereby become the owner of said land, the United States have failed and refused to issue a patent to said plaintiff, as required by said act. The value of the disputed premises is alleged to be $6,000, and of the ore extracted, over $100. Plaintiff prays judgment for possession of the premises and of the value of the ore extracted.

*F. M. Dudley* and *Cullen, Sanders & Shelton*, for plaintiff.

*Adkinson & Miller*, for defendants.

Before SAWYER, Circuit Judge, and KNOWLES, District Judge.

SAWYER, J., *(after stating the facts as above.)* The complaint undoubtedly states many facts, not necessary to be stated in a complaint to recover land. It not only sets up the probative, as well as, the ultimate, facts necessary to be stated to make a good complaint, but the facts which the defendants will rely upon to defeat the action. The object doubtless, is, to state all the facts, as they really exist, or are supposed to exist, with a view to having the rights of the parties on that state of facts determined in the simplest form upon a demurrer to the complaint. Although somewhat cumbersome in a pleading in an action at law, I see no objection, the defendants making none, to taking the course pursued by plaintiff in this case, provided it has set out sufficient facts, to show upon the whole case, a good cause of action. The defendant has not moved to strike out any part, as being irrelevant or redundant, but has met the case fairly by a demurrer, both parties, doubtless, being desirous of having their rights determined in the shortest, easiest, and least expensive manner.

Taking all the facts as alleged in the complaint, I think there can be no doubt, that the title to the land in controversy is in the plaintiff, unless the allegation of the discovery of mines in 1888, is sufficient to show that the land containing them is mineral, within the meaning of the term as used in the act of congress; and, that the lands are, therefore, within the exception from the grant to plaintiff of mineral land. This being the case it becomes necessary to determine, definitely, what congress meant by the words "not mineral" in the first part of section 3, and the words "mineral lands," in the clause "that all *mineral lands* be, and the same are hereby excluded from the operation of this act," in the third proviso of the same section. And the meaning of these terms is the great question, so elaborately and ably discussed by counsel of the respective parties, upon which the decision of the demurrer, it is conceded, must turn. For the purposes of this decision, I shall assume, that the complaint shows a discovery of valuable mines in 1888, when the several claims alleged were located—such as would have taken them out of the grant, had they been *known*, at the time when the line of the road was definitely fixed. This question is not new to the circuit court for the northern district of California; or to the state courts of California and Nevada, as a reference to the decisions of the supreme courts of these states will show. The circuit court had occasion to consider the precise point, fully, and directly decide it in *Francoeur* v. *Newhouse*, 14 Sawy.

351, 40 Fed. Rep. 618, arising under the legislative grant to the Central Pacific Railroad Company, of July 1, 1862, (12 St. 489.) The words of exception in the act are "that *all mineral lands* shall be excepted from the operation of this act." After mature consideration, in that case, it was held, the circuit and district judges concurring, that, the meaning of the term, "mineral lands," as used in the exception, is, lands that were not only mineral, in fact, at the time the grant attached and took effect, but that they must be lands that were *known* to be mineral, or at least, such as were apparently mineral, and generally recognized as such, 14 Sawy. 355, 40 Fed. Rep. 622. The court there said:

"The next question is, did the land in question pass, by the grant of 1862, perfected in 1866–67, in which a gold mine was discovered in 1883, twenty-one years after the grant attached, by the filing of a plat of the general route of the railroad, and the withdrawal of the lands in pursuance of the statute, by the secretary of the interior, and more than seventeen years after the completion of the road, and its acceptance by the president; and more than sixteen years after the final survey, and report of the lands as agricultural, and not mineral. The parties to this grant, both the United States and the grantee, must be presumed to have contemplated a grant in view of the condition of the lands as they were known, or appeared to be, at the time the grant took effect. In the exception of 'mineral lands' from the grant, congress could not have contemplated that the discovery of a paying mine, fifteen or twenty years after the making of the grant, and the performance of all the conditions by the grantee, required to perfect the title, and render it irrevocable, should vitiate the grant. If so, then such a discovery fifty, or one hundred years after, would effect the same result. In granting the public lands, congress must be presumed to deal with them in view of the conditions as they are known, or supposed to be, at the time. Exceptions must be presumed to refer to matters that are readily apparent upon inspection. Any others would be altogether too indefinite to be valid. The conditions constituting the exception ought, certainly, to be ascertainable at the time the grant takes effect, or they ought not to be operative; otherwise, the greatest confusion and inconvenience, public and private, must, necessarily, result. The grant should point out what is granted in such certain terms, that the grantee may be able to ascertain by inspection, and know at the time the location is, definitely, fixed, and it becomes operative, what specific tracts of land are granted, and what are excepted from the grant. These lands soon after the grant, were conveyed, in trust, under authority of the law, as security for the bonds issued, out of the proceeds of which the road was constructed; and the proceeds of these sales are devoted by the trustees to the redemption of the bonds. Is this security to be impaired, or destroyed, by taking from the operation of the grant all lands in which at any future time gold, or other valuable metals may be discovered? If so, all of the lands may, sooner or later revert to the United States, and bondholders, and those, who in good faith, have purchased the lands of the company, without being aware of the mines secluded in their lower depths, will be largely injured. These words 'mineral lands,' as used in the act, must be construed in a practical sense—as practical men would use them in contracting about them—must be construed with reference to their present known, or at least, obviously apparent, condition." 14 Sawy. 355, 356, 40 Fed. Rep. 620, 621.

The circuit court had before made, substantially, the same ruling in *Cowell* v. *Lammers*, 10 Sawy. 257, 21 Fed. Rep. 200, and in *Milling Co.* v. *Spargo*, 8 Sawy. 645, 16 Fed. Rep. 348. The supreme court of the United

States, although the precise question had not been necessarily presented, had by implication held the same way in the several cases referred to in the decision in *Francoeur* v. *Newhouse*, cited.   Upon further consideration, I am still satisfied, upon principle, with the ruling in those cases, and think, that to hold otherwise, would be disastrous to the great interests of all the states having mines of the precious metals, and to none more so than the state of Montana.   The defendants' counsel assail the decision in *Francoeur* v. *Newhouse*, and insist that the title to no land which, *in fact*, contained valuable mines secreted in its lower depths at the time the grant attached to the specific lands and became perfect, passed to the company under the railroad grant, though the existence of the mineral was unknown, and unsuspected, at the *time*, and there was nothing to indicate that any mine was there—even though the existence of the mine could not by reasonable diligence have been ascertained. And one of the senators from Montana, in an elaborate speech in the senate during a session of the last congress, criticising the opinion in *Francoeur* v. *Newhouse*, with great ability supported the same view.   Said he, in the course of his speech:

"If one thousand years hence, a mine is discovered in an odd‑section of land which it will pay to work, thereby it will be demonstrated that on the 2d day of July, A. D. 1864, *congress had that particular land in view,* when it said 'we except that mineral land out of the grant,' and that it not only then becomes, but it is thereby demonstrated that it has always been, during the thousand years the property of the United States." 21 Cong. Rec. p. 10946.

And a senator from California, a most skillful mining expert, and a large owner of mines in Montana, interrupted the senator's speech with the observation, " *In a thousand years from now, I have no doubt mines will be found in many of those lands.* "   Id. 10,947.   Either the doctrine of *Francoeur* v. *Newhouse*, or that stated by the senator from Montana, as quoted, must be the true doctrine.   There is no middle ground upon which to stand.   No middle line can be drawn, and statutes of limitations do not run against the United States.   Nearly all statutes require construction.   Such is the imperfection of the human intellect, and human language that it is difficult, if not impossible, to draft an act, that shall, exactly, cover every possible case contemplated by the author, and nothing more; and that his intent shall be apparent to every intelligent mind.   The statute of frauds of England, drawn by one of England's ablest lawyers, is a good illustration.   It is said by English law-writers, that it has required a great many more suits to settle the meaning of the statute of frauds, than there are words in the statute.   This act of congress, evidently, requires construction, otherwise there could be no possible ground for difference of opinion as to its meaning among, reasonably, intelligent persons.   And it must receive a reasonably sensible construction; a reasonably practical construction; a construction that will enable reasonably intelligent men to determine at the time the grant attaches, what was granted, and what excepted from the operation of the grant; a construction that will afford reasonable certainty, as to land

titles. A meaning must be given to it, that reasonably intelligent practical men would be likely to *deliberately contemplate* in passing the act. Such a construction I conceive was given to the Central Pacific grant in *Francoeur* v. *Newhouse*. But the construction urged by the senator, and counsel in this case, would be unreasonable in the extreme, *and utterly impracticable and absurd in its consequences*—a construction as it appears to me, that no sensible practical man could ever *deliberately contemplate*. It would be, absolutely, destructive and subversive of all titles to land in the state of Montana, and all new states wherein are similar grants; or, at least, destructive and subversive of all confidence in and security of titles. A severer blow could not well be struck at the interest and prosperity of the state, at large, of Montana, and other states similarly situated, than to adopt that construction, and thereby destroy all confidence in titles to land. Nothing is more conducive to the prosperity of a state, than unassailable land-titles, and a feeling of confidence, and a sense of security in such titles. Adopt the construction insisted upon, and no man from Lake Superior to Puget sound, within the exterior bounds of the railroad grant, whether on the odd, or even sections, would know whether he has a title to land purchased either from the government or the railroad company, until a mine either has been, or shall hereafter, at some time in the future more or less distant, be discovered on it, when he will, know for the first time, that he has no title. Indeed this state of things would not be confined to the lands of the railroad grants, but would extend to all lands in the state. Mineral lands have always been, and they are, now, excepted and reserved from pre-emption, homestead entry, and all other ordinary modes of disposition except congressional, in, substantially, the same language, as that in the railroad grant. Every patent issued for mineral lands to a pre-emptor, homesteader, or other purchaser, *within the meaning of the exception*, is utterly void and passes no title, at least, upon a direct, and not collateral attack. This is conceded by the senator from Montana, and must be by counsel. They all stand upon the same footing with the railroad company, and its grantees, except, that, the latter can do without a patent, as the title passes irrevocably by the congressional grant, and the performance of the conditions subsequent. The patent adds nothing as a title. It is only a convenient instrument of evidence, in the language of the statute "*confirming* not transferring to said company the right and title to said lands."

It does not seem possible that congress, deliberately, intended to leave the titles to all lands in the new states in a state of such lamentable *uncertainty*,—a condition of things utterly destructive to the interests, and obstructive of the prosperity and progress of those states. The mining interests, whatever the case may now be, will, ultimately, become one of the least important. If congress had intended such unnatural and undesirable results, it could have easily expressed its intention in unmistakable language. It provided no means, and no tribunal to determine, upon examination for the purpose, what lands were mineral, within the meaning of the act. It did not require the railroad company, or anybody

on behalf of the government, to prospect the lands to ascertain what were mineral.    And had it done so, in most instances it would have been unavailing, so far as ascertaining the real condition of the land is concerned. Repeated prospecting, at different times, and, by different parties, in practical work, is often required to disclose a mine.    Without any provision for, positively, determining what lands are mineral, for the purposes of the act, at the time the grant attaches, there can be but one reasonable and safe rule, and that is to exclude those which are known to be mineral, or which upon inspection can be readily ascertained to be mineral. The odd sections are *the subject-matter of the grant, and the mineral lands in the odd sections are the exceptions.*    The latter are taken out of the former. Now, the exceptions should be readily identified by inspection.    If they cannot be identified by inspection, they are too indefinite and uncertain to be valid, and they must be void for uncertainty.    The exception must be specifically pointed out, so that it can be readily ascertained. Exceptions are strictly construed.    As an illustration, take a case on a section of the road where the line of the road is definitely located; the road is finished, and all the conditions subsequent are fully performed, the road accepted, and the title to whatever is within the grant, be it more or less, irrevocably vested in the railroad company.    The lands are surveyed.    So far as can be known by inspection and superficial examination, the lands appear to be timber lands, agricultural lands, or grazing lands, and they are in good faith purchased as such from the railroad company, and occupied as such by the purchaser.    Are these lands, so situated, against the will of the purchasers, open to wandering prospectors to enter at will upon them, dig up the earth, sink shafts, run drifts, tunnels, etc., to see if they can find a mine?    And failing to find a mine, is the land open year after year for other bands of prospectors to enter and repeat the performance *ad infinitum?*    And should a mine, at last, after years of prospecting be found, is the purchaser to have his land taken from him on this exception?    Yet such must be the consequence of the construction insisted upon by the defendants.    If one quarter section is thus open to exploration, and the title thereto liable to be thereby defeated, by a discovery of a mine at any time, no matter how long, in the future, then every foot of land within the limits of the railroad grant, and even outside these limits, from Lake Superior to Puget sound, is in the same situation, and the title liable to be defeated in the same manner.    No man can ever know whether he has a title or not, until a mine is discovered, when he learns that he has no title, but that the land belongs to the United States.    I cannot bring my mind to believe it possible, that men of the intelligence and sound sense of those who constitute the senators, and members of the house of representatives in congress, could have *deliberately and knowingly intended or contemplated any such result.*    And what adequate object is to be attained by such a construction as will destroy titles and be subversive of all confidence in titles to land in all these new states?    For whose benefit is this extraordinary and hurtful condition of things to be imposed on the new states?    Is it, that the government may obtain the insignificant

sum of $6 per acre for a small strip of land here and there at long distances apart, not exceeding 1,500 feet long by 600 feet wide? Or is it to give a preference to purchasers at that insignificant price, over permanent settlers, who have already purchased, paid for and improved lands in good faith, to a comparatively few nomadic prospectors, who remain at the same place but a short time?

Should it turn out in course of time, that indications of mines appear, the owners will be quite as likely to prospect for and discover any mine, that may be concealed in the depths of the earth there, as the professional prospectors; and the country, at large, will, in the end, be equally benefited by the result. Is there any object to be accomplished by such an unreasonable, and impracticable construction of the grant as is claimed for it, leading to such absurd consequences, that will compensate for the great wrong and injury that must, necessarily, be inflicted on the new states by removing all grounds for confidence in land-titles? When a dispute arises as to whether the land was *known* mineral land when the grant attached, it may always be safely intrusted to a jury to determine the point. As an instance see the special verdict and charge of the court on the trial of this same case cited of *Francoeur* v. *Newhouse*, 14 Sawy. 600, 43 Fed. Rep. 236. When the United States made the railroad grant, in order to secure the construction of that great transcontinental road through thousands of miles of a comparatively unsettled region, it intended to offer something *substantial* as an inducement. It *gave* nothing, for as usual, it doubled the price of all alternate sections, and, by the completion of the road made a market for these lands at the enhanced price. A large development of the resources of the country was also, thereby induced. Besides the government saved millions in the cost of transporting the mails, military forces, supplies, etc. For the United States, now, years after the road has been built, and been in successful operation, to insist upon the construction maintained by defendants is to discredit all the titles of the railroad company, and of those holding titles under it; to throw insuperable obstacles in the way of selling these lands by thus discrediting the titles, and to thereby deprive the company of the substantial aid, which it had reason to believe it was to receive upon the performance of the conditions of the contract on its part. There can, possibly, no benefit result to the United States, or to any persons, or classes of persons, designed to be favored thereby, by the construction of the act of congress insisted upon by defendants, that will at all compensate for the wrong to the railroad company and its grantees, occasioned by discrediting these titles, and the blight put upon the prosperity of all those new states, by destroying and subverting all grounds for confidence in the land-titles of those states. I am, myself, still satisfied with the rule laid down in *Francoeur* v. *Newhouse*. The court did not, it is true, pass upon the Northern Pacific grant, but it did construe substantially, the same language in a strictly cognate, and analogous provision, and I do not, myself, see how it can hold differently with reference to the railroad grant now in question, without overruling its prior decision. But the supreme court of the United

States, in *Davis* v. *Weibbold*, 139 U. S. 507, 11 Sup. Ct. Rep. 628, a case but recently decided, has, as it appears to me, authoritatively, decided the question now involved, in strict accordance with the foregoing views.   But for the fact, that it has been questioned by counsel, and my associate, whether this ruling, because arising under a townsite act, and not a railroad grant, is applicable to the case in hand, I should myself have supposed that the point was not open to any further doubt or discussion.   Had it not been for this contention on their part I should have deemed it necessary, only, to refer to the case, and leave the matter there without further history of the question, and the prior discussion upon it, or further argument.   The plaintiff in that case, relied upon a patent for a mine, bearing date January 15, 1880. The defendant upon a prior patent, issued under the town-site act, for the town-site of Butte, in Deer Lodge county, Montana, dated September 26, 1867, and conveyances from the patentee to the defendant.   The latter being the earlier patent contained the clause, that *"no title shall be hereby acquired to any mine of gold, silver, cinnabar, or copper."* The town-site act, under which the patent issued, provides that *"no title shall be acquired,"* under its provisions, *"to any mine of gold, silver, cinnabar or copper."* (Rev. St. § 2392.)   And the general statute also provides: that *"in all cases lands valuable for minerals shall be reserved from sale,* except as otherwise directed by law."   Section 2318.   At the trial, after introducing this patent for the town-site and subsequent conveyance to him, defendant offered to prove by sundry witnesses that, *"at the time the patent to the town-site was issued, the premises embraced by the Gold Hill lode were not known to be valuable for minerals of any kind."*   Objection was made to this evidence on the ground that the patent to defendants *proved* that the premises in fact contained valuable minerals, and therefore, could not under the statute be granted by patent for a town-site, which objection was sustained, an exception entered, and an appeal thereon taken.   The question before the supreme court, and upon which the decision turned, was, whether the provision of the statute, that "no title shall be acquired" under the act "to *any mine*" merely, meant "any *known* mine;" or in other words, whether if there was no "*known* mine" on the land at the date of the patent, a mine *existing in fact,* but not discovered till some years afterwards, passed by the patent, notwithstanding the express prohibitory provision in terms so broad and comprehensive, of the statute?   Or whether the provision only meant "known mine?"   And the supreme court held that it was limited to *known* mines, and that the title to a valuable mine *not known* at the date of the patent, that is to say when the grant attached to the land, did pass under the patent, notwithstanding this prohibitory provision, so comprehensive in its terms, and, that, there was nothing left in the government to pass under the subsequent patent to those who had discovered the mine after the issue of the first patent.   The court, consequently, held, that the exclusion of the evidence offered to prove that there was no "*known* mine" at the date of the patent, was erroneous; and it reversed the judgment on that ground alone.

It is urged, in this case, that to hold that a mine must have been *known* to exist at the date, when the railroad grant attached, in order to exclude it from the grant, is to unreasonably and without authority, introduce into the statute the word "*known.*" If that be so, then the same must be true as to the provision of exception or exclusion in the townsite act, that "*no title* shall be acquired" under its provisions "to *any* mine of gold, silver, cinnabar or copper," construed by the supreme court, in *Davis* v. *Weibbold.* Will it be seriously said, that the supreme court unwarrantably introduced the word "known" into that act, thereby largely limiting the scope of the exception, and largely enlarging the scope of the granting power of the act, *as intended by congress?* If this is the result, it was not attained, and this construction of the act, was not adopted, by any hasty ill-considered action of the court, for that tribunal deliberately reached its conclusion "after much consideration." Says the court:

"*When the entry of the town-site was had, and the patent issued, and the sale was made to the defendant of the lots held by him, it was not known—at least it does not appear that it was known—that there were any valuable mineral lands within the town-site, and the important question, is, whether in the absence of this knowledge the defendant can be deprived under the laws of the United States of the premises purchased and occupied by him because of a subsequent discovery of minerals in them and the issue of a patent to the discoverer. After much consideration we have come to the conclusion that this question must be answered in the negative.* It is true that the language of the Revised Statutes touching the acquisition of title to mineral lands within the limits of town-sites is very broad. The declaration that 'no title shall be acquired' under the provisions relating to such town-sites, and the sale of lands therein 'to any mine of gold, silver, cinnabar, or copper; or to any valid mining claim or possession held under existing laws,' would seem on first impression to constitute a reservation of such mines in the land sold, and of mining claims on them, to the United States; but such is not the necessary meaning of the terms used; in strictness, they import only that the provisions by which the title to the land in such town-sites is transferred shall not be the means of passing a title also to mines of gold, silver, cinnabar, or copper in the land, or to valid mining claims or possessions thereon. They are to be read in connection with the clause protecting existing rights to mineral veins; *and with the qualification uniformly accompanying exceptions in acts of congress of mineral lands from grant or sale. Thus read they must be held, we think, merely to prohibit the passage of title under the provisions of the town-site laws to mines of gold, silver, cinnabar or copper, which are known to exist, on the issue of the town-site patent, and to mining claims and mining possessions, in respect to which proceedings have been taken under the law or custom of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth. The exceptions of mineral lands from pre-emption and settlement and from grants to states for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness and to justify expenditure for its extraction, and known to be so at the date of the grant.* There are vast tracts of country in the mining states which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their

exploitation. It is not to such lands that the term 'mineral' in the sense of this statute is applicable." 139 U. S. 518, 11 Sup. Ct. Rep. 632.

The closing paragraph shows that the court did not consider itself as limiting its construction to the town-site act, and such provisions, only, as have been here seriously contended, whether correctly or not, were alone *in pari materia.* It shows that the court considered the ruling as applicable to "grants for the construction of public buildings: *in aid of railroads and other works of internal improvement,*" as well as to pre-emption, town-site, etc., grants. The cases cited from the state, and circuit courts of the United States, are nearly all cases of railroad grants, and the long citation, with approbation, from *Cowell* v. *Lammers,* 10 Sawy. 246, 257, 21 Fed. Rep. 200,—a case arising under a railroad grant,— contains the passage laying down the rule as now established by the supreme court in the case cited, to-wit: "By the words '*mineral lands*' must be understood lands *known* to be such, or which there is satisfactory reason to believe are such at the time of the grant or patent." After citing numerous rulings of the departments, the uniform decisions of the state and circuit courts, and *its own implied recognition of the rule as stated in Cowell* v. *Lammers, and, now adopted in Davis* v. *Weibbold,* where the decision of the point, as it is the great issue in the case, could not be avoided, the court proceeds:

"In connection with these views it is to be borne in mind also, that the object of the town-site act was to afford relief to the inhabitants of cities and towns upon the public lands, by giving titles to the lands occupied by them, and thus induce them to erect suitable buildings for residence and business. Under such protection many towns have grown up on lands which previously to the patent, were part of the public domain of the United States, with buildings of great value for residence, trade and manufacture. It would be in many instances a great impediment to the progress of such towns if the titles to the lots occupied by their inhabitants were subject to be overthrown by a subsequent discovery of mineral deposits under their surface. If their title would not protect them against a discovery of mines in them, neither would it protect them against the invasion of their property for the purpose of exploring for mines. The temptation to such exploration would be according to the suspected extent of the minerals, and being thus subject to indiscriminate invasion, the land would be to one having the title, poor and valueless, just in proportion to the supposed richness and abundance of its products. *We do not think that any such results were contemplated by the act of congress or that any construction should be given to the provision in question which would lead to such results. Our conclusion as already substantially stated, is, that congress only intended to preserve existing rights to known mines of gold, silver, cinnabar or copper, and to known mining claims and possessions, against any assertion of title to them by virtue of the conveyances received under the town-site act, and not to leave the titles of purchasers on the town-sites to be disturbed by future discoveries.*" 139 U. S. 525, 11 Sup. Ct. Rep. 635.

These observations as to the great impediment which the construction insisted upon by defendants, would throw in the way of the prosperity of towns, apply, as we have already seen, with, at least, equal if not greater force with reference to the obstruction to the progress and pros-

perity of the state at large, should that construction be adopted as to the railroad grants in question.    If the decision in *Davis* v. *Weibbold*, does not, strictly, apply to, and, fully, cover the question we are now called upon to decide, I confess I do not know to what it does apply, except to another case arising under the same town-site act, wherein the mines were discovered, located, and patented years after the issue of the patent to the town-site.    The court intimates no such limitation.    It refers to the various forms of the exception in the various acts making grants for *public improvements, universities, railroads, and acts excluding mines from pre-emption, and homestead acts, etc.*, and cites the decisions arising under them all, tending in the same direction, as though they all stood upon the same footing, as they, evidently, do.    Each only provides for carrying out the public policy of the nation to exclude mineral lands from the operation of all these statutes.    Though differently expressed, in the different acts, they all were intended to accomplish the same object, and all mean the same thing.    What difference can there be in the meaning of the following phrases found in different acts?    "That all mineral lands, be and the same are hereby excluded from the operation of this act." N. P. Co. grant act, (13 St. 367, § 3.)    "That all mineral lands shall be excepted from the operation of this act."    C. P. R. Co. grant act, (12 St. 492, § 3.)    "In all cases, lands valuable for minerals shall be reserved from sale, except as otherwise, expressly, directed by law."    Rev. St. 2318.    "No title shall be acquired under the foregoing provisions of this chapter to any mine of gold, silver, cinnabar or copper."    Town-site act, (Rev. St. 2392.)    "No lands on which are situated any known salines or mines shall be liable to entry under and by virtue of the provisions of this act."    Pre-emption law of 1841, (5 St. 456, carried into Rev. St. § 2258.)    Now all these acts with reference to the questions now under consideration appear to me to be *in pari materia*, and I am satisfied that they were intended to carry out the same line of public policy, and were intended to mean the same thing.    The first act of 1841, says "*known* salines or *mines;*" and such, doubtless with reference to mines was what was intended by the subsequent acts.    If there is any difference in the other provisions on this point, the town-site act is stronger against the construction adopted by the supreme court than those in the railroad acts, as it forbids the acquisition of title "to *any* mine of gold," etc.,—no *one* mine can pass.    But the same constructions as to this point must be given to all these provisions.    There can be no distinction made.    In my judgment therefore, the decision in *Davis* v. *Weibbold*, covers, and concludes, this case.    This case also affirms the ruling in *Cowell* v. *Lammers*, 10 Sawy. 246, 21 Fed. Rep. 200, and in *Deffeback* v. *Hawke*, 115 U. S. 392, 406, 6 Sup. Ct. Rep. 95, that the insertion in a patent of an exception, not expressly authorized by law, is void.

A question has also been suggested in this case, as to when there must be a "*known mine*" in order to take it out of a grant to the railroad company under the exception in the grant?    The four points of time suggested, are, the date of the act of congress making the grant; the time of the filing of a map of the general route; the time of the definite loca-

tion and filing a plat thereof in the office of the commissioner of the general land-office, and the date of the issue of a patent. The ruling of the circuit court for the district of California, heretofore has been, that the date of the definite location of the line of the road, is the date at which the mineral character of the land must be known, in order to take it out of the grant. Thus upon the trial of *Francoeur* v. *Newhouse,* the court so charged the jury. The following is the language of the charge:

"The words 'mineral lands,' as used in the act of congress, mean lands known to be mineral at the time the grant took effect, and attached to the specific land in question, or which there was satisfactory reason to believe were such at said time. Only such land as was known to be mineral, or which there was satisfactory reason to believe was mineral at the time the grant attached to the land, is excepted from the grant. * * * The question then arises, whether or not they were known, or there was sufficient reason to believe, at the time this grant attached—and that is when the line of the road became definitely fixed, according to my construction of the act—to be mineral land." 14 Sawy. 603, 604, 43 Fed. Rep. 238.

Until that time the grant is *a float,* and does not attach to any particular land. No one, till then, can know upon what land the grant will, ultimately, fall. Up to the definite fixing of the line of the road, it is all public land, and there is nothing to prevent any interest recognized by this law, not otherwise prohibited, from being acquired. The railroad company up to that time has acquired no interest in any specific odd section of land; but at the moment the line is definitely fixed, and a plat filed in the office designated by law, the grant attaches itself to all odd sections not embraced in any of the exceptions; and the title of the company becomes indefeasible except by a failure to perform the conditions subsequent, and the taking of proper means to forfeit the grant by the government. Upon the performance of the conditions, the title in the company, before, in a certain sense inchoate, becomes perfected and indefeasible. If none of the exceptions are operative to prevent the title from vesting when the line is so definitely fixed, of course, the title takes effect, by relation from the date of the act, without affecting any other vested interest whatever. But if the land is within one, or more, of the exceptions, at the time the grant would, otherwise, attach, it is taken out of the grant altogether, and nothing passes, either present, or by relation to the date of the granting act. Thus, if an odd section is *known mineral land,* at the date when the grant would otherwise attach, it is not within the grant, and no vested interest is affected, either present, or by relation. So, under section 6, which protects the lands for the company within 40 miles of the *general line* after it shall be fixed, from sale, entry or pre-emption by other parties, till the company can, definitely, fix its line, does not prevent the discovery of a mine, or prevent a mine from becoming *known* at any time before the line is definitely fixed, as prescribed by law; and should there be a *known* mine, when the company's grant attaches to the specific lands by definitely fixing its line, I apprehend, that it would not pass by the grant, whether anybody else, by " purchase, entry or pre-emption," could acquire an interest in the *known* mine or not. There is no provision in the act against the discovery of

a mine, or against a mine becoming known during the withdrawal from sale, in such sense as not to bring it within the exceptions of the grant to the railroad company, and thus take it out of the operation of the grant. And when a discovery of a mine is once made, *before the grant attaches*, the land is at once brought within the exception, and taken out of the scope of the grant, and is no longer within the prohibitory clause of section 6, and it is not perceived why a mining claim may not be at once located. It can no longer be regarded as one of "the odd sections of land hereby granted," within the meaning of the provision of section 6 that "the odd sections *hereby granted* shall not be liable to sale, or entry, or pre-emption," except to the company. · The following passage from the decision of *Davis* v. *Weibbold*, referring to a former decision would seem to reach and cover this point. Says the court:

"We stated there that land embraced within a town-site on the public domain, when unoccupied, was not exempt from location and sale for mining purposes, and referred to the fact that some of the most valuable mines in the country were within the limits of incorporated cities, which had grown up on what was on its first settlement a part of the public domain. We were speaking at that time of town-sites *for which no patent had been issued*, and of mines in public lands, for immediately after using these expressions, we said: ' *Whenever, therefore, mines are found in lands belonging to the United States*, whether within or without town-sites, they may be claimed and worked, provided existing rights of others, from prior occupation, are not interfered with.' "

If this view be correct, and I think it is, then the ground of the *objection suggested* that the limitations of the exception of the grant to *mines known* at the date when the grant attaches by a definite fixing of the line of the road, would take from the holders all mines discovered between the date of the act of July 2, 1864, and the definite location of the road, 18 years thereafter, on July 6, 1882, *fails*; for such mines, so discovered, and *known before July 6, 1882, would be excluded from the grant*, by the exception.

It has been urged, also, that, in some instances, the line of the road, as finally definitely located, and fixed, and upon which it is now constructed, is not within 100 miles from the *general* line at first fixed, and under the provisions of section 6, the lands within 40 miles of which were for the time being withdrawn from "sale, or entry or pre-emption" except by the railroad company; and that the construction insisted upon by defendants, would be disastrous to all parties, discovering, and locating, mines within that 40-mile belt from the date of the act till the final definite location of the line in 1882. But this objection is answered by what is said in the last paragraph, that there is no provision in the act against mines becoming *known*, at any time, before the grant attaches by the definite location. If the mines are *then known*, they fall within the exception. Besides, the moment the line of the road becomes, definitely fixed, in the mode prescribed by the act, no matter when it is, the lands within 40 miles of the *general* line, not within the prescribed distance from the line as finally definitely fixed, are, necessarily, discharged from the disabilities imposed in section 6, for they, thereafter,

never can become "the odd sections of land *hereby granted*," within the meaning of that section.   The decision in *Davis* v. *Weibbold*, also, affirms the ruling in *Francoeur* v. *Newhouse*, 14 Sawy. 358, 359, 40 Fed. Rep. 618, that a patent issued to land in which the title has already passed out of the United States, is utterly void, and may be shown to be void even in an action at law to recover the land.   If it is necessary that the land should be known to contain valuable mines in order to bring it within the exception of the grant, then in opposition to the rule hereinbefore expressed, it is insisted that the point of time when the land should be known to be mineral, in order to exclude it, is, not when the line of the road is definitely fixed, but the time when the patent issues —that the title to the land does not vest until the issue of the patent, and the character of the land, as it is then known, or supposed to be, is to control.   The passage from the decision of the circuit court in *Cowell* v. *Lammers*, 10 Sawy. 257, 21 Fed. Rep. 200, that "there must be some point of time, when the character of the land must be finally determined, and, for the interest of all concerned, there can be no better point to determine the question, than at the time of issuing the patent," is quoted, to sustain this view.   This observation; perhaps a little too general, was made with special reference to the facts of that case, wherein, the railroad company had not only fixed its line, and completed its road, but a patent had issued to it in conformity with the statute, covering the mine, years before the mine was discovered, and located.   The title therefore had not only vested under the legislative grant, but the question as to the right of the company to the land as being non-mineral, had been determined in its favor, and the grant was *confirmed* by the patent, while the locator of the mine had nothing as evidence of title. He had simply by a trespass upon lands, thus determined to be private property, discovered, and located a mine.   He was, therefore, in no position to, collaterally, assail the title of the plaintiff, as is well settled by numerous decisions of the supreme court.   It was with reference to this condition of things, that the observation was made, proper enough, as applicable to the facts of that case, but certainly not intended to impugn the decision of the supreme court, as to the time, when the title to the lands, under the statute, *actually first* vested in the railroad company. That the title vests upon the definite location of the road, subject only to be defeated by failure to perform the conditions subsequent and proper measures thereupon taken to forfeit the grant, had been so often decided by the supreme court, that it did not seem open to further argument. Yet, the question was again raised under the identical act now in question, in the case of *St. Paul, etc., R. Co.* v. *Northern Pac. R. Co.*, 11 Sup. Ct. Rep. 389, (recently decided,) and that construction was emphatically reaffirmed.   If possible, the point of the ruling is stated in more perspicuous and unmistakable language than in any former case; and I shall, therefore, quote liberally from the decision, as it appears to place beyond all possible grounds of doubt, the time when the lands must be *known* to be valuable for its minerals, in order to bring them within the exceptions of the legislative grant.   Says the court:

"As seen by the terms of the third section of the act, the grant is one *in præsenti*, that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, pre-emption, or other disposition previous to the time the definite route of the road is fixed. The language of the statute is 'that *there be and hereby is granted*' to the company every alternate section of the lands designated, *which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route* not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, *when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved.* It is in this sense, that the grant is termed one *in præsenti; that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route.*" 139 U. S. 5, 11 Sup. Ct. Rep. 390.

Thus, it is said, the language—

"Implies that the *property itself* is passed, *not any specific or limited interest in it. The words* also import a *transfer of a present title, not a promise to transfer one in future.* * * * The title does not *attach* to any specific sections until they were capable of identification, but when once identified, *the title attached to them,* as of the date of the grant, *except as to such sections* as were specially reserved. It is a grant '*in præsenti,*' as to all lands within the terms of the grant, and *not reserved from it at the time of the definite location of the grant.*"

Is it possible to express, more clearly, the idea maintained in this opinion, as to when the grant *attached and title passed,* and, consequently, *when the lands must be known* to be mineral, in order to bring them within the exceptions of the grant? And lands *known* to be mineral, as the provision is construed by the supreme court, and, then only, are the lands excluded on the ground that they are mineral. Again, says the court:

"It is contended that they are qualified and restricted by the provision of the fourth section, that whenever 25 miles of the road are completed in a good, substantial and workman-like manner, and the commissioners appointed to examine the same have made a report to that effect to the president, patents shall be issued 'confirming to said company the right and title to said lands situated opposite to and coterminous with said completed section of said road.' *This provision, it is urged, is inconsistent with the theory that a title to the lands had previously vested in the company. We do not think so.*" 139 U. S. 6, 11 Sup. Ct. Rep. 390.

Thus, the court recognizes the fact, that the provisions of the act as to issuing patents, describes the patent as only "*confirming*" the title *already vested, not as, originally, granting, or passing the title.* And again:

"The construction we give to the granting terms of the act, as qualified by subsequent provisions, not only secures the application of the property to the construction of the road and telegraph line, and thus carries out the purposes of the government, *but also secures the company against any attempted alienation of the land to other parties.*" 139 U. S. 7, 11 Sup. Ct. Rep. 391.

Thus, the legislative grant *in præsenti,* in the act, "*secures the company against any attempted alienation of the land to other parties.*" So, in *Davis* v. *Weibbold,* already cited, reaffirming prior decisions, the court says:

"We agree to all that is urged by counsel as to the conclusiveness of the patents of the land department when assailed collaterally in actions at law. We have had occasion to assert their unassailibility in such cases in the strongest terms, both in *Smelting Co.* v. *Kemp*, 104 U. S. 636, 640–646, and in *Steel* v. *Smelting Co.*, 106 U. S. 447, 451, 452, 1 Sup. Ct. Rep. 389. They are conclusive in such actions of all matters of fact necessary to their issue, where the department had jurisdiction to act upon such matters and to determine them; *but if the lands patented were not at the time public property, having been previously disposed of*, or no provision had been made for their sale, or other disposition, or they had been reserved from sale, *the department had no jurisdiction to transfer the land, and their attempted conveyance by patent is inoperative and void, no matter with what seeming regularity the forms of law have been observed.* In the several cases to which we have been referred in the fifth and sixth Montana Reports, (*Milling Co.* v. *Clark*, 5 Mont. 378, 5 Pac. Rep. 570; *Talbott* v. *King*, 6 Mont. 76, 9 Pac. Rep. 434; *Butte City Smoke-House Lode Cases*, 6 Mont. 397, 12 Pac. Rep. 858,) which involved contests between parties claiming under mining patents and others claiming under town-site patents, and in which very able and learned opinions were given by the supreme court of the territory of Montana, the mining claim patented had been located and the rights of the mining claimant had thus attached before the town-site patent was issued. The patent, which, subsequently, followed was a mere perfection of the right originated by the location, and to which it took effect by relation. It was held in accordance with this opinion, that the prior mining location was not affected by the town-site entry." 139 U. S. 529, 11 Sup. Ct. Rep. 636.

So, that, in this class of cases, the ascertainment, and final determination as to the mineral character of the land, as against the company, cannot, as contended be left to the commissioner on the issue of the patent. And if the determination be so made, his decision against the company would not be conclusive, as to whether the title to the land had or had not already passed out of the United States under the congressional grant. A patent wrongfully issued to others, however, could be collaterally attacked, by the company on its patent, even in an action at law, and the company without a patent could stand upon its legislative grant attaching upon the definite location and completion of the road as required by the act, even against subsequent patents, wrongfully, issued to other parties. Indeed the commissioner is not in a position, in this class of cases, to summon witnesses and, intelligently, investigate, and finally decide the facts as to the mineral character of all the odd sections of lands, either at the date of the attaching of the grant, or of the issue of the patent; and if he were invested with such final jurisdiction, the point of time to which the investigation should be directed, would be, the date when the line of the road became definitely fixed, and a plat thereof filed in the office of the commissioner of the landoffice—the date at which the grant became attached to the specific sections of land, and not the date of the issue of the mere *confirmatory* patent. Again on his views of the law, the commissioner often refuses to issue patents to the railroad company in cases where it is entitled to them. In such cases the company would have no remedy, as to those lands, unless the foregoing views are correct. There could then be no patent to settle the question.

Under these various decisions of the supreme court, and others cited by that tribunal, with approbation, I am satisfied that to exclude the lands from the operation of the grant, they *must be known to be mineral at the date when the line of the road becomes definitely fixed, and a plat thereof filed in the general land-office,*—in this case on July 6, 1882,—and that the demurrer to the complaint must be overruled. My associate dissents in a very able opinion, in which he very, forcibly, and lucidly, presents, as it seems to me, all that can be said in opposition to the views herein expressed. My own conclusions, however, I have reached after repeated and thorough examination, and I cannot see the case in any other light. The points of difference between us, therefore, must be left to the supreme court, to authoritatively, determine.

This, I believe, is a representative case—several others depending upon its decision. I suppose the facts in the complaint are alleged as they must turn out in the proofs. If that be so, then a default might be safely suffered, and a judgment entered before the 1st of July, and an appeal taken to the United States supreme court. Otherwise, the appeal will go to the circuit court of appeals. It is desirable that a question affecting interests so vast should be determined by the highest court in the land. Under the provisions of section 650, Rev. St., when there is a difference of opinion between the circuit and district judges, sitting together, the opinion of the presiding judge prevails for the time being. In pursuance of these provisions, let the demurrer to the complaint be overruled, and the defendants have 10 days within which to file their answer.

KNOWLES, J., (*dissenting.*) This is an action at law. The complaint sets forth sufficient facts to show that plaintiff received a grant from the United States of all odd alternate sections of land within 40 miles of the line of its railroad as definitely located in Montana, not mineral, and which at the time its line of railroad was definitely fixed, were not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights. It is further set forth that the land described in the complaint was a portion of one of the said odd sections within 40 miles of the line of the road of plaintiff as definitely located; that defendants have taken possession of the same, and now withhold the possession thereof from plaintiff. It is not stated directly that the said land is non-mineral, but that it was not known to be such at the date of said grant on July 2, 1864, nor, at the time the general route of said railroad was located in 1872. It is alleged, however, that it was more valuable at said dates for grazing, than mining purposes and that when the land was surveyed in 1868, it was returned by the surveyor as non-mineral. In 1886, it is alleged that plaintiff listed in the United States land-office at Helena, with other lands, the premises in controversy, and paid for filing such list the fees allowed by law, and the receiver duly accepted the same and approved of said list, and certified the same to the commissioner of the general land-office, and that that list remains in both land-offices, and no part of the fees so paid have been returned to

plaintiff. It is also alleged that at the time of filing said list said land was not known to be mineral, or had any value for mining purposes, but that during the year 1888, certain veins or lodes of rock in place bearing gold, silver and other precious metals were discovered thereon, and thereafter to-wit, on the 20th day of June, 1888, a portion of defendants and under whom the others claim located said lodes as mineral land under the name of the "Vanderbilt," "Four Jacks," "N. Y. Central" and "Hudson River" respectively, and on the 9th day of May, of said year, another lode under the name of the "Chauncey Depew" lode, and that they are now in possession of said locations and are extracting ore therefrom, and have taken therefrom ore of over the value of $100, and that the value of all the property is over $6,000. The defendants have demurred to this complaint, on the ground that the same does not state facts sufficient to constitute a cause of action.

There is, undoubtedly, much in this complaint that might be called redundant or irrelevant matter. But concerning this the court is not called to rule. If a complaint states facts which show that plaintiff is not entitled to recover, then the ground of demurrer, that it does not state facts sufficient to constitute a cause of action will lie. In this case plaintiff undertook to set up certain facts which would show that the land in controversy was within the grant to it, and not within the exception of that grant as being mineral, as that grant, it claims, should be interpreted. In order to recover for rents, issues and profits, the location of lodes on the premises and the extracting of ore therefrom is averred. It appears also that no patent had ever issued to plaintiff for the premises. While the complaint is not as satisfactory as it might be, upon the point as to whether the premises are now known to be mineral land or not, still, I think enough appears to show that they are of that character. It appears that they are over the value of $6,000, and that over $100 worth of ore has been taken from them, and that the lodes located contain gold and silver. I do not conceive that in determining whether or not land is mineral land the question is whether or not it is more valuable for the mineral therein, than it is for grazing or agriculture. The statute of the United States, upon mineral lands is "in all cases land valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." Rev. St. U. S. § 2318. So I would say, that lands which have a market value for the minerals therein, without any reference to any other character or quality connected therewith are mineral lands. I do not think it is necessary to show that the lands contain paying mines. Such has not been the accepted definition of mineral lands in the land department of the United States, or by those engaged in mining avocations in this country. Land is being claimed almost every day as mineral, which contain no such mines, and the United States land department is almost daily issuing patents for such lands as mineral. The term "mineral lands" must be considered as having been used by congress in the sense in which that term was used by practical men in mining engaged in that industry at the date of the grant. Lands are often sold for large sums of money on account of the

minerals therein which have never been worked to a profit for such. With this definition of mineral lands, I think it safe to say that the premises in controversy must be classed as mineral.

The question then arises, whether, not having been known to be mineral at the date of the grant of land to plaintiff on July 2, 1864, nor at the date when the general route of its road was located in 1872, nor at the time it was listed by plaintiff for patent as within its grant, in 1886, but now, known to be mineral, it must be classed as within plaintiff's grant. The grant of land to the Northern Pacific Railroad Company, is contained in the third section of the statute of the United States organizing that company, and the part necessary to be considered in this case is as follows:

"That there be and is hereby granted to the Northern Pacific Railroad Company, its successors and assigns for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe transportation of the mails, troops, munitions of war and public stores, over the route of said railway, every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad where it passes through any state, and whenever on the line thereof the United States have full title not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office: * * * Provided, further, that all mineral lands be, and the same are hereby excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands in odd-numbered sections nearest to the line of said road may be selected as above provided."

The contention of plaintiff is that the above grant is one *in præsenti* conveying the fee to it at the date thereof, and that it should embrace all lands within the limits of its grant not known to be mineral, or which there was no reasonable ground for believing to be mineral at such date. In other words, in the exception, and in the proviso in the grant in regard to mineral lands it should read, not known to be mineral or which there was no reasonable ground for believing to be mineral. This brings up for consideration the question, as to how this grant should be construed. It is a public or legislative grant made by a statute of congress.

"In all questions of construction arising under grants between the government and the citizen, a different rule prevails in one respect from that adopted in questions between individuals. Between the latter, the construction if doubtful, is always to be in favor of the grantee and against the grantor, whereas in the case of the government, the construction is always against the grantee and in favor of the government." 3 Washb. Real Prop. (4th Ed.) p. 190.

One of the leading cases upon the subject of legislative grants is that of *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420. It is a case very often referred to, and is the foundation of much of the federal jurisprudence upon this point. The decision was delivered by the distinguished

Chief Justice TANEY, and in it the court said: "The rule of construction in such cases is well settled both in England, and by the decisions of our own tribunals." In 2 Barn. & Adol. 793, in the case of *Stourbridge* v. *Wheeley*, the court says:

"The canal having been made under an act of parliament, the rights of the plaintiff are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute, and the rule of construction in all such cases is now fully established to be this, that any ambiguity in the terms of the contract must operate against the adventurers, and in favor of the public, and the plaintiff can claim nothing that is not clearly given by the act."

This rule of construction is fully adopted by the supreme court in the above case. This question came again before the supreme court in the case of *Railroad Co.* v. *Litchfield*, 23 How. 66, and it holds this language, in referring to a legislative grant similar to the one of plaintiff's under consideration:

"All grants of this description are strictly construed *against* the grantees; nothing passes but what is conveyed in clear and explicit language, and as the rights here claimed are derived entirely from the act of congress, the donation stands on the same footing of a grant by the public to a private company, the terms of which must be plainly expressed in the statute, and if not thus expressed they cannot be implied."

And in this case the court quotes with approval, the reason for this rule of construction from, *Gildart* v. *Gladstone*, 11 East, 675:

"The reason of the above rule is obvious—parties seeking grants for private purposes usually draw the bills making them. If they do not make the language explicit and clear to pass everything that is intended to be passed, it is their own fault, while on the other hand such a construction has a tendency to prevent parties from inserting ambiguous language for the purpose of taking by ingenious interpretation and insinuation, that which cannot be obtained by plain and express terms."

In the case of *Rice* v. *Railroad Co.*, 1 Black, 360, the supreme court say: "It is the settled rule of construction that public grants are to be construed strictly and that nothing passes by implication." It has been urged, however, that the legislative or public grant in the case at bar was for a valuable consideration and should therefore be subject to the same rule of construction as grants between private parties, and hence liberally in favor of the grantee, and in such a manner as to give it a full and liberal operation, so as to carry out the legislative intent. It is not necessary now to discuss this rule of interpretation and show its limitations.

Every one of the above legislative grants referred to were made upon the same consideration as the grant to plaintiff, namely the construction of an internal improvement of some value to the public. The supreme court, however, has held that all these grants are subject to be strictly construed, and in the case of *Leavenworth, etc., R. Co.* v. *U. S.*, 92 U. S. 733, it was held that all these railroad grants should receive a strict construction against the grantee. In that case the court held this language:

"The difference would seem to imply obscurity in the act; but be this as it may, the rules which govern the interpretation of legislative grants are so well settled by this court, that they hardly need be reasserted. They apply as *well to grants of land to states to aid in building railroads* as to grants of special privileges to private corporations. In both cases the legislature, prompted by the supposed wants of the public, confers on others the means of securing an object the accomplishment of which it desires to promote, but declines to undertake."

Here is a distinct assertion that these rules of interpretation apply to all such railroad grants as plaintiff's. And in this case, again, in regard to the rules of construction of the grant then under consideration says:

"It should be neither enlarged by ingenious reasoning, nor diminished by strained construction, the interpretation must be reasonable, and such as will give effect to the intent of congress. This is to be ascertained from the terms employed, the situation of the parties, and the nature of the grant. If the terms are plain and unambiguous, there can be no difficulty in interpreting them, but if they admit of different meanings, one of extension, and the other of limitation, they must be accepted in a sense favorable to the grantor. And if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of congress to confer them. In other words what is not given expressly, or by necessary implication, is withheld."

Upon this point of the construction of legislative grants I have quoted liberally from the masters in the domain of our jurisprudence, and their language gives no uncertain sound. Legislative grants must be construed most strongly against the grantee, and must not be enlarged by implication. In looking at the terms in the grant we find mineral lands are excepted therefrom. This was in accordance with the settled policy of the government. In the case of *Mining Co.* v. *Consolidated Min. Co.*, 102 U. S. 167, the supreme court held that it was the public policy of the United States not to dispose of its mineral lands as agricultural, or in any other way than as mineral lands to be devoted to the pursuit of mining, and as provided in a special statute upon that subject. And in that case the court on account of this well-known policy inserted into a grant of the sixteenth and thirty-second sections of land to the state of California for common schools, an exception of mineral lands, although, no such terms appear in the grant. This was based upon the ground, that considering this settled policy of congress, it could not have intended to grant to California, for school purposes, mineral lands. The Northern Pacific Railroad Company grant was one *in præsenti* as I have said conveying the legal title. This view although I conceive to be in conflict with other decisions of the supreme court, upon this point, is supported it appears, to me, by the later decisions of that distinguished tribunal. *Buttz* v. *Railroad Co.*, 119 U. S. 55, 7 Sup. Ct. Rep. 100; *Railroad Co.* v. *Price Co.*, 133 U. S. 496, 10 Sup. Ct. Rep. 341; *Denny* v. *Dodson*, 13 Sawy. 68, 32 Fed. Rep. 899. The title of plaintiff took effect on July 2, 1864. By inserting the words into its grant, known mineral lands or lands which there were reasonable grounds for supposing were mineral, and it is apparent, then, that in Montana, and northern Idaho, along the route of plaintiff's road, its grant would be materially enlarged. On

July 2, 1864, comparatively little was known of the great mineral resources of this section. There were but two mining camps of any importance in Montana, at that time and one of these was south of the 40-mile limit of that road. The great quartz mining interests of Montana, were then almost, if not entirely, unprospected. In northern Idaho no mineral developments had been made worthy of mention, nothing was known of its great mineral resources. It may be said that the only mines then sought for were placers. But few miners in this section knew anything of silver or copper mining, and none had any knowledge of the extent of these mines along the route of plaintiff's road. Silver mining had not existed in the United States for more than five years previous to 1864, and gold quartz mining in the western states and territories, not more than ten years. Copper mining was only known on the shores of Lake Superior in Michigan. None of this country had been surveyed. Plaintiff did not know just what route would be selected for its road. It had not been surveyed even in a preliminary way. Large portions of the country had never been explored, except by wandering bands of trappers. Gold mining confined to placers, had existed in Montana, for only two years. Under these circumstances it is reasonable to suppose that congress knew that there was but little known of the mineral resources of this section. That if it intended to exclude only known mineral lands, or those concerning which there were reasonable grounds for considering were mineral, it was not excepting any extent of mineral lands, and it might as well have left out that exception in the grant. Considering the settled policy of the government in regard to its mineral lands, and the rules of construction of legislative *grants* and the limited knowledge which prevailed in regard to the mineral resources along the route of plaintiff's road at the date of the grant, and I do not think it proper to extend that grant by inserting the words desired in the exception of mineral lands therein. I see no reason for enlarging that grant by adding words or terms not placed there by congress. In the case of *Leavenworth, etc., R. Co.* v. *U. S.*, 92 U. S. 733–751, the supreme court quoted with approval these words from *Rex* v. *Burrell*, 12 Adol. & E. 460: "I see the necessity of not importing into statutes words which are not found there, such a mode of interpretation only gives occasion to endless difficulty." And the supreme court adds: "Courts have always treated the subject in the same way when asked to supply words in order to give a statute a particular meaning which it would not bear without them." In the case of *Newhall* v. *Sanger*, 92 U. S. 761–765, the court said, in interpreting a statute: "It is said this means, lawfully claimed, but there is no authority to import a word into a statute in order to change its meaning." We were met in the argument in this case with the assertion that it was not sought by plaintiff to insert any words into the grant. That the word "known" was a part of the definition of mineral lands; that lands were not mineral lands until they were known to be such. In other words the Comstock lode of Nevada; the rich placers of Alder gulch and Confederate gulch; and the valuable lodes at Butte City in Montana, were not mineral lands until they were

discovered to be such. Up to this time they were agricultural land. It appears to me that this is a novel and original term to be imported into the definition of mineral land, and I cannot consent to its use. I think hereafter I may show how this word "known" came to be used in connection with mineral lands, and that it had nothing to do with the definition of the same. I do not see how congress could have declared more emphatically than it did in this act, that it did not intend to grant to plaintiff mineral lands. In the granting clause in the section making the grant, it excepted mineral lands; then in a proviso attached to the same said: "That all mineral lands be, and the same are hereby excluded from the operation of this act."

The only question of difficulty is, to determine, what are mineral lands, and when this is reached they did not pass to plaintiff in its grant. I cannot consent to any construction of that grant which will modify and enlarge its terms. It is true that the learned court, in the case of *Francoeur* v. *Newhouse*, 40 Fed. Rep. 618, made a construction of the legislative grant of land to the Central Pacific Railroad Company which is adverse to this view. The grant of land to that company was made in terms almost identical to that made to plaintiff. The construction of that grant in that case in effect placed the word "known" before mineral in that grant, or the terms "which there was reasonable ground to suppose or believe were mineral." The distinguished judge who rendered that opinion gave the weight of his great reputation, to that construction. He has given many years of labor to interpreting congressional and other grants, and to the construction of the mineral statutes of the United States. For years, upon the subject of the law in regard to mineral lands, I have been accustomed to follow him. He is the presiding judge of this circuit; hence it is with much hesitancy and some trepidation that I assume to differ with him in this matter. He held that he was forced to his conclusions on account of the rulings of the supreme court in the cases of *Deffeback* v. *Hawke*, 115 U. S. 399, 6 Sup. Ct. Rep. 95, and *Colorado Coal, etc., Co.* v. *U. S.*, 123 U. S. 309, 8 Sup. Ct. Rep. 131. In neither of these cases was the supreme court considering statutes like the grant to the plaintiff. In the first the court was called upon to construe the statute in relation to the entry and purchase of town-sites. In this case the policy of the government was reviewed in regard to mineral lands. In this connection the court considered the pre-emption and homestead laws as well as the town-site act. They were classed together, and it was held that only the same character of lands could be purchased under any of these acts. It was found that under the pre-emption and homestead acts, lands containing known salines and mines, could not be purchased. In the town-site act it was provided that by virtue of its provisions no title should be acquired "to any mine of gold, silver, cinnabar or copper, or to any valid mining claim or possession held under existing laws." The court was then confronted by the mineral act of congress, the first section of which provides: "In all cases lands valuable for minerals shall be reserved from sale except as otherwise expressly provided." These statutes were all *in pari materia,* and hence the court

was authorized to construe them together. They are general statutes relating to one subject, the sale and disposal of the public lands. They had to be harmonized. And the court held that under the above acts, in regard to pre-emptions, homesteads and town-sites, land could be purchased which was not known to be mineral. In this case, nowhere, was there anything that would bear upon grants of land to private corporations in aid of the construction of railroads. Here for the first time, we find the phrase "lands known at the time of the sale to be valuable for minerals." The court said:

"It is plain from this brief statement of the legislation of congress, that no title from the United States, to land known at the time of the sale to be valuable for its minerals of gold, silver, cinnabar or copper, can be obtained under the pre-emption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands except, in the states of Michigan, Wisconsin, Minnesota, Missouri, and Kansas."

I think hereafter I may be able to show why the court used the above language: "lands known at the time of its sale to be valuable for its minerals," etc. In the case of *Colorado Coal, etc., Co.* v. *U. S.*, *supra*, the court was called upon to construe the pre-emption act, and the mineral act. It classed coal lands as mineral lands and following *Deffeback* v. *Hawke*, *supra*, said, that lands known at the time of sale to contain mines, or which were at that time known to be valuable for the minerals therein contained, could not be obtained under the pre-emption act. In this, there was no construction of any such grant as plaintiff's.

In the argument in this case, the recent decision in the supreme court of *Davis* v. *Weibbold*, was cited. This was an action on the part of a mineral claimant who had obtained a patent to a parcel of land within the exterior limits of the Butte town-site, which patent was subsequent to that of the patent for the town-site. The defendant, Davis, offered to prove that at the time of the issuing of the patent which would relate of course, to the time when the sale of the Butte town-site was consummated, that the premises embraced within the Weibbold patent, were not known to be valuable for minerals. This evidence was introduced for the purpose of showing that the land was subject to purchase as a town-site at that time. This was excluded, and the defendant, Davis, appealed to the supreme court of the United States, assigning this ruling among others, as error. Now in this case all that the court was called upon to consider was the mineral act and town-site act, and statutes *in pari materia*. There are some declarations in that opinion which taken by themselves, might lead to the inference, that the court had expressed its opinion upon the point at issue. For instance it says:

"It would seem from this uniform construction of that department of the government specially intrusted with the supervision of proceedings required for the alienation of the public lands including those that embrace minerals, and also of the courts of the mining states, federal, and state, whose attention has been called to the subject, that the exception of mineral lands from grants, in the acts of congress, should be considered to apply only to such lands as were at the time of the grant known to be so valuable for their minerals as to justify expenditure for their extraction. *The grant or patent when issued*

*would thus be held to carry with it the determination of the proper author-*
*ities that the land patented was not subject to the exception stated."*

In connection with a railroad grant like plaintiff's, which was made by
an act of congress, it would be difficult to speak of it as having issued
to plaintiff. "Issued," when we speak of a deed or patent usually means
"delivered." In considering a legislative grant the term does not apply.
What are the proper authorities to determine that any lands were not
subject to an exception stated in a grant, if we confine ourselves to the
date of the grant? Congress when acting officially usually expresses its
determination in laws. It is a legislative, not a judicial body. If con-
gress has not determined this matter by the terms of its enactments, I
cannot see how it has determined it at all. The grant to plaintiff was
in the nature of a float, and attached to no specific land until the date
the line of its road was definitely fixed, and a plat thereof filed in the
office of the commissioner of the general land-office. It was some 18
years after the date of the grant before this definite route was fixed in
Montana. Can it be, that congress, 18 years before the grant took pre-
cision in any way, determined what land was not subject to the excep-
tion stated in the grant? I think this cannot be maintained. I cannot
help thinking, that the term "grant" used in the above quotation, was
used as synonymous with the term "patent," or of land specifically de-
scribed. The land department is a special tribunal intrusted with the
power, I think, of determining such matters, and does determine them
when awarding a patent. If, however, it should be considered that the
term "grant" as used in that clause referred to legislative grants like
plaintiff's, then that question in that case was not before the court for
consideration, and the rule of the supreme court as expressed in *Cohens*
v. *Virginia,* 6 Wheat. 264, applies: "That general expressions in every
opinion are to be taken in connection with the case in which these ex-
pressions are used. If they go beyond the case they may be respected,
but ought not to control the judgment in a subsequent suit when the
very point is presented for decision." There was no argument or facts,
in the case of *Davis* v. *Weibbold,* upon which to base any ruling upon the
construction of the terms of plaintiff's grant. It is said, however,
that the statute making plaintiff's grant, and the town-site act are *in pari*
*materia,* and the construction of one applies to the other. In the first
place, the terms in the town-site act the court was called upon to con-
strue, are very different from those in plaintiff's grant. In the next
place, the statutes are not *in pari materia.* They do not relate to the
same subject. The town-site act is a general law providing for the dis-
posal of public lands in certain cases. It is part of a system of laws
upon the subject of the disposal of such lands. The grant to plaintiff,
is one to a private corporation, to aid it in constructing a railroad. If it
is *in pari materia* with the general laws upon the subject of the disposal of
public lands, then every grant to a private or public corporation in aid
of railroad construction is *in pari materia* with such general laws, and it
follows must be *in pari materia* with each other. In the case of *United*
*Soc.* v. *Eagle Bank,* 7 Conn. 457, the supreme court of that state said:

"But private acts of the legislature, conferring distinct rights on different individuals which never can be considered as being one statute or the parts of a general system are not to be interpreted by a mutual reference to each other. As well might a contract between two persons be construed by the terms of another contract between different persons."

And in speaking of the phrase "*pari materia,*" the court said: "It is a phrase applicable to public statutes or general laws made at different times, and in reference to the same subject." The act making the grant to the plaintiff is not a public statute or general law. It does not therefore appear to me that the case of *Francoeur* v. *Newhouse, supra,* can be considered as supported by the cases cited in the opinion rendered in that case, or when properly considered by the case of *Davis* v. *Weibbold, supra.*

I come now to the consideration of how the phrase "known mineral lands," came to be used. In the case of *Johnson* v. *Towsley,* 13 Wall. 72, the doctrine was recognized, that the land department was a special tribunal, having authority to hear and determine questions which might arise in the sale and patenting of public lands. In the case of *Steel* v. *Smelting Co.,* 106 U. S. 447, 1 Sup. Ct. Rep. 389, in speaking of the land department, the supreme court said:

"That department as we have repeatedly said was established to supervise the various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of congress are fully complied with. Necessarily therefore, it must consider and pass upon the qualifications of the applicant, the acts he has to perform to secure the title, *the nature of the land* and whether it is of the class open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable, except by direct proceedings for its annulment or limitation."

In the case of *French* v. *Fyan,* 93 U. S. 169, the land department having determined that a certain tract of land was swamp land, the supreme court treated this as the determination of a special tribunal which was binding in all actions not brought to annul the patent. In that case the court said: "The patent therefore which is the evidence that the lands contained in it have been identified as swamp land under the act relates back and gives certainty to the title of the date of the grant." This and the preceding decision referred to, certainly maintain the doctrine that the land department is clothed with authority to determine whether land is mineral or swamp, or not. Following these decisions are the cases of *Milling Co.* v. *Spargo,* 8 Sawy. 645, 16 Fed. Rep. 348, and *Cowell* v. *Lammers,* 10 Sawy. 246, 21 Fed. Rep. 200. The opinions in both of these cases was delivered by the distinguished judge who delivered the opinion in the case of *Francoeur* v. *Newhouse, supra.* In the first, he said: "The land-officers were charged with the duty of ascertaining whether the lands were subject to be patented or not, and that determination is conclusive at least in this action." In the latter case he said: "There must be some point of time when the character of land must be finally determined, and for the interest of all concerned there can be no better point to determine this question *than at the time of issuing the patent.*" The learned judge then proceeds to show how disastrous to his section of the

country any other ruling would be.   The case of *Davis* v. *Weibbold, supra*, fully sustains the view that the land department is intrusted with the determination of the question, as to whether land is mineral or not. And shows that this is in accordance with the view in several cases in both state and federal courts, and in accordance with the view the land department has of its own powers and its practices.   But while the land department is intrusted with these powers, still, if in determining these facts, as to whether land is mineral or not, it is imposed upon by fraud, or there has occurred a mistake, their determination may be set aside and the patent they have issued annulled.   If the land was known to be mineral at the time of issuing of the patent by the grantee, it has been treated as fraud sufficient to annul the patent thereto.   *U. S.* v. *Rose*, 11 Sawy. 83, 24 Fed. Rep. 196; *U. S.* v. *Iron Silver Min. Co.*, 24 Fed. Rep. 568, 128 U. S. 673, 9 Sup. Ct. Rep. 195; *Colorado Coal, etc., Co.* v. *U. S.*, 123 U. S. 307, 8 Sup. Ct. Rep. 131.   In the case of *Mullan* v. *U. S.*, 118 U. S. 271, 6 Sup. Ct. Rep. 1041, the supreme court set aside a patent for former coal-lands where there was no fraud practiced, but because there was a mistake in regard to the law as to coal-lands being included in the term "mineral lands."   In the case of *McLaughlin* v. *U. S.*, 107 U. S. 526, 2 Sup. Ct. Rep. 802, the supreme court set aside a patent because it was known at the time the patent was issued, that the land embraced in the patent was mineral land, and hence the patent was issued through inadvertence and mistake and without authority of law.   I have found no cases where the land department has passed upon the question of the character of land patented, that the patent has been sought to be set aside, except for some fraud practiced upon the land department, or there was some mistake, such as would entitle the United States to relief in a court of equity.   If the land was not known to be mineral, no fraud was practiced in that department, and the title to such land was unassailable.   Sedg. St. & Const. Law, 390.   These were the reasons that induced the supreme court in *Deffeback* v. *Hawke, supra*, to declare if the land was not known to be mineral at the date of the sale or issuing a patent, there was no cloud upon a patent title for such land purchased as agricultural.   And this is the reason why the term "known mineral lands" was used.   The same rules which apply to agricultural lands obtained under the homestead, pre-emption or townsite acts would undoubtedly apply in issuing patents to railroad lands. The case of *Cowell* v. *Lammers, supra*, was a patent for earned railroad lands.   In the case of *Denny* v. *Dodson*, 13 Sawy. 68, 32 Fed. Rep. 899, the court said that a patent would identify the lands which are coterminous with the road completed, and in the case of *Railroad Co.* v. *Price Co., supra*, the supreme court said of patents to lands granted *in præsenti* to railroads: "They would serve to identify the lands as coterminous with the road completed."   The land department is charged with the duty of issuing patents for earned railroad lands to plaintiff, and in so doing it must determine the character of the lands to which a patent is to issue, and as to whether they are such as are within the terms of the grant, and hence must determine as to whether they are mineral or not.

Until a patent is issued these lands are not fully identified, and in any action concerning them the railroad company must resort to other evidence to identify them, and show that they are the lands granted. When a patent issues this will show that the land described in the same, are lands granted to the company, and no other identification will be needed. And this patent only can be impeached by an action in equity brought by the government to set the same aside for fraud or on some other ground cognizable in a court of equity, and will prevail in any action against any one claiming by a junior title. *Meader* v. *Norton*, 11 Wall. 442.

I do not think congress intended to leave it always an open question to be settled by the verdict of a jury as to whether or not any specific portion of an odd section within the limits of plaintiff's grant were granted to it or not. But if the question for consideration is whether or not, a given piece of land was known to be mineral at the date of plaintiff's grant, how is it to be otherwise determined? It cannot be supposed that the land department before it issues to plaintiff a patent for any tract of land is to enter upon the investigation as to whether it was known to be mineral or not on the 2d day of July, 1864. What means has the land department for entering upon such an investigation? If the grant attaches to all lands not known to be mineral at the date of the grant the determination of the land department that any land was not known to be mineral at any date subsequent to the date of the grant, ought to have no effect upon the grant or any binding force upon any body. There was something said in the argument presented in this case that the grant of plaintiff would attach to all lands not known to be mineral at the time the line of plaintiff's railroad was definitely fixed and a plat thereof filed in the office of the commissioner of the general land-office, and the grant of plaintiff received precision. This is not a doctrine I supposed, was contended for in any other case but the one at bar. It was not generally supposed that the case of *Francoeur* v. *Newhouse*, *supra*, maintained such a doctrine. The general scope of the opinion of the court in ruling upon the demurrer in that case leaves a very different impression. In that case, (14 Sawy. 355, 40 Fed. Rep. 620, 621,) the learned judge said:

"The parties to this grant, both the United States, and the grantee, must be presumed to have contemplated a grant in view of the condition of the lands as they were known or appeared to be at the time the grant took effect. * * * The conditions constituting the exception ought certainly to be as ascertainable at the time the grant takes effect, or they ought not to be operative."

Considering this language in connection with that used in the case of *Railroad Co.* v. *Price Co.*, *supra*, and there cannot be much doubt as to its force. In that case the supreme court in construing a grant in terms similar to that of plaintiff's said:

"The grant was therefore, until such location a float. But when the route of the road was definitely fixed the sections granted became susceptible of identification, and the title attached to them and took *effect as of the date of the grant* so as to cut off all intervening claims."

The same language is used in *Missouri, etc., Ry. Co.* v. *Kansas Pac. Ry. Co.*, 97 U. S. 491. In the light of these decisions it was natural to suppose the court had said the land should be viewed when considering this question, at the date of the grant. When that case came on for trial, the court instructed the jury that in his opinion the time when the land must be known to be mineral, to except it from the grant of the Central Pacific Railroad Company, must be, when the "grant attached," and that was, "when the line of the road was definitely fixed." This language is not in accordance, in my opinion, with the previous opinions of that learned judge, upon this subject, nor in accordance with that used in *Denny* v. *Dodson, supra*, where the court says: "The grant therefore is in the nature of a float, and the title does not become definitely attached to specific sections until they are capable of identification. But when they are once identified the title attaches as of the date of the grant." Nor in accordance with that used by the supreme court, in the case of *St. Paul, etc., R. Co.* v. *Northern Pac. R. Co.*, 11 Sup. Ct. Rep. 389, (not yet officially reported.) In that case the supreme court says: "The route at the time, not being determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification, but when once identified, the title attached to them as of the date of the grant."

If there is any legal difference between the term, "the title attached by virtue of the grant," or "the grant attached," I have been unable to discover it. As the grant was one *in præsenti* it must have attached at its date, although the property conveyed by it was not identified, or described, until the route of plaintiff's road was definitely fixed. It can hardly be contended that the title to land within plaintiff's grant, concerning which there should arise no dispute as to its agricultural character, would attach as of the date of the grant, but that as to land which should be discovered to be mineral subsequent to the location of the fixed route of the road, it would attach when the line of that road should be definitely located, and not at the date of the grant. The act of fixing the definite line of plaintiff's railroad had no tendency to determine or identify the nature of the odd sections within plaintiff's grant, although it determined what odd sections were within the limits of that grant. This fixed route, was an object from which they could be ascertained, but not the character of these odd sections. The fixing of the definite line of plaintiff's road, was its own act, and a matter which involved no action on the part of the government. How then can it be said that at this time, any department of the government determined whether any given piece of land was mineral or not, or it was known to be mineral, or there was reasonable ground for believing it mineral? The view that in construing plaintiff's grant, we should insert into the same, "was known to be mineral," or "there was reasonable ground for believing was mineral," or "it was apparently mineral at the time the route of plaintiff's road should be definitely fixed," involves more difficulties than the first construction discussed. The land department has no means of determining such facts. The issue would still be an open one to be de-

termined by a jury. It seems to be contended that so much land might be found to be mineral within the limits of plaintiff's grant as to render the same worthless. When such proves to be the fact, there will be an occasion for considering this question.

The question as to whether the terms of this grant to plaintiff should have been so specific as to fully identify all lands excepted from the grant to the end that it might appear what lands were granted to plaintiff, is not a matter for judicial, but legislative, consideration. If the grant is too indefinite, that is a matter between congress, who made the grant, and plaintiff, who accepted it. If the terms of the grant do not fully identify the lands embraced, or sought to be embraced in a legislative grant, a court has no right to supply terms to remove the difficulty. As I have before shown, there are no implications to be indulged in, when construing a legislative grant. In interpreting a statute, a court ought not to consider what reasonable men should have intended when acting in a legislative capacity, but what they did intend, by the language used. Said the learned Justice FIELD, in *Hadden* v. *Collector*, 5 Wall. 107:

"What is termed the policy of the government with reference to any particular legislation, is generally a very uncertain thing upon which all sorts of opinions, each varient from the other may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes."

When the language of a statute is free from ambiguity, the court has no right to consider the consequences of the act. The business of a court is not to improve, but interpret a statute. Endl. Interp. St. p. 9, § 6.

It appears to me, that the learned circuit judge, in this case has allowed himself to consider too much the consequences of interpreting the statute under consideration according to its terms, rather than the meaning of those terms. Consequences should be in the mind of the legislature. But if we are to consider the consequences of a certain interpretation, it does seem to me that the construction, that the land must be considered at the time of the definite location of the road, as to whether it is known to be mineral, or it is apparently mineral, or there is reasonable ground for believing it to be mineral, would result in about as much dispute as to land-titles within plaintiff's grant, as any other construction that could be made. As I understand the learned circuit judge, he does not say, that the land must be known to be mineral by any particular person, or any one person must have reasonable ground for believing it to be mineral, or it must be apparently mineral to any one person at the time the definite route of the road is fixed, but if upon inspection by any experienced person, such would be found to be the condition of the land, it should be classed as mineral. Some of our experienced prospectors have great confidence in their ability to determine whether or not land is apparently mineral from a very casual observation of the same. In questions arising upon disputes upon this point their services would be in great demand. The surest means of quieting titles would appear to be, the determining the question of the mineral character

of the land upon issuing of patents to the same. As I have said, this would be conclusive upon all subsequent purchasers. It is perhaps true, that if it was determined that land was mineral, which was in fact agricultural, the railroad company would not be precluded thereby, as it is a prior, not a subsequent purchaser, to the issuing of the patent. But there would not be as much litigation arising from this source, nor so much anxiety about titles therefrom, as from the construction that would leave it an open question as to whether land was known to be mineral, or there was reasonable ground for believing it mineral, at the time the route of the road should be definitely fixed. I do not think it can be maintained, that a patent would determine these questions. It could only determine the nature of the land at the date it is awarded. The land department has always acted upon this theory. For more than 20 years it has been the practice of the land department, to recognize mineral locations and issue patents for mineral land found within the limits of the Northern Pacific Railroad Company's grant upon odd sections which have been discovered to be such since the date of that grant, and for about 10 years since the date of the definite fixing of the route of plaintiff's road, sometimes these patents have issued without any reference as to whether they were for lands upon odd, or even sections, the general surveys of the government not having extended to such locations. The land department, has thus left it to the prospecting miner, up to this date, to identify the mineral lands which are excepted and excluded from plaintiff's grant. Until patents are issued which will identify the lands granted to plaintiff, the government can perform any acts it may think necessary to enable it to identify the mineral lands excepted from plaintiff's grant, and the government can avail itself of all information given it, even by prospecting miners, which has resulted in disclosing and identifying mineral lands within the limits of plaintiff's grant. A long and uninterrupted practice under a statute, by the officers of the executive department of the government who are compelled to act under it, is entitled to great weight in construing it, and in cases of doubt is controlling. *McKeen* v. *Delancy*, 5 Cranch, 22; *U. S.* v. *Graham*, 110 U. S. 219, 3 Sup. Ct. Rep. 582; *The Laura*, 114 U. S. 411, 5 Sup. Ct. Rep. 881; *Brown* v. *U. S.*, 113 U. S. 568, 5 Sup. Ct. Rep. 648; *Peabody* v. *Stark*, 16 Wall. 240.

The action of the land department, which has been called upon to act under the land laws of the United States, shows that it has never considered that lands which were not known to be mineral at the date of plaintiff's grant, or at the time the route of its road was definitely fixed passed with it. It has recognized the location for mining purposes upon mineral lands upon odd sections which has been discovered to be mineral since the date of that grant, and since the date of the fixing of the definite route of plaintiff's road, and as I have said, has not hesitated to award patents for such mineral claims. Some of the most valuable mining properties in this state are upon odd sections of land within plaintiff's grant, the mineral character of which was discovered since the said dates. The filing of the list by plaintiff of the lands claimed by it, and

for which it desired a patent, in my judgment, constitutes no element in determining the question at issue. That was the act of plaintiff, and no action which would amount to a determination of the character of the land claimed, appears to have been taken by the land department, and there was no law authorizing such action in filing a list of lands by plaintiff.

For these reasons, I hold that the defendants having discovered that the premises in dispute were mineral land, had a right to locate them as such, and that they are not lands granted to plaintiff, and that the demurrer of defendants ought to have been sustained to plaintiff's complaint.