## OAKES et al. v. MYERS, Jefferson County Treasurer.

(Circuit Court, D. Montana. June 22, 1895.)

No. 365.

1. TAXATION—PROPERTY IN HANDS OF RECEIVER.

Property in the hands of a receiver of a federal court cannot be reached by proceedings for the collection of state taxes, without the consent of such court. In re Tyler, 13 Sup. Ct. 785, 149 U. S. 164, followed.

2. PUBLIC LANDS—NORTHERN PACIFIC RAILROAD GRANT—TITLE—TAXATION.

Until the final determination by the government as to what lands within the limits of the grant to the Northern Pacific Railroad Company (Act Cong. July 2, 1864) are mineral, in accordance with the provisions of the grant excepting such lands from its operation, and with Act Cong. Feb. 26, 1895, requiring such determination to be made before the issue of any patent for the lands, no title of any kind to any of the lands within the grant passes to the company, and none of such land is taxable by the states in which it lies. Wisconsin Cent. R. Co. v. Price Co., 10 Sup. Ct. 341, 133 U. S. 496, and Barden v. Northern Pac. R. Co., 14 Sup. Ct. 1030, 154 U. S. 288, followed.

This was a suit by Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse, as receivers of the Northern Pacific Railroad Company, against William V. Myers, treasurer of Jefferson County, Mont., to enjoin the collection of a tax. The defendant demurred to the bill.

John C. Spooner and F. M. Dudley, for complainants.

H. J. Haskell, Atty. Gen. of Mont., for defendant.

BEATTY, District Judge. The complainants, as receivers of the Northern Pacific Railroad Company, by this action ask to enjoin the collection of taxes levied by the state of Montana, and in their complaint allege concerning the grant, by act of congress of July 2, 1864, to aid in the construction of the Northern Pacific Railroad, of the odd sections of land within the place limits of the grant, that the company has in all respects performed all the acts devolving upon it; that it desires its patent for the lands in question, and has made its demand upon the government therefor, but has been refused the same for the reason that no mineral lands are included in the grant; that some of the lands in such odd sections may be mineral; that the government is investigating the facts, and will not issue its patent until it shall have determined them; that the company cannot now know or designate the lands it will finally procure title to; that in this condition of the title the defendant, as the authorized officer and agent of the defendant county, has assessed against said company taxes on all the lands in said odd sections, regardless of the fact of their mineral or nonmineral character, and is proceeding to sell them for nonpayment of such taxes, and that such taxation and sale of the lands would cloud the title thereto. Upon the complaint, Judge Knowles of this district issued a temporary restraining order against such threatened sale, and to the complaint the defendant demurs, assigning as causes: First, that the complaint does not state such a cause of action as entitles complainants to the relief prayed; and, second, nonjoinder of necessary parties. The first, being the

only ground argued or relied upon, will alone be considered. Preliminary to the main question is raised another,—that all the lands to which the railroad company may have any claim or title, being in the hands of the receivers of this court, are in custodia legis, and cannot without the consent of the court be sequestrated by any other authority. That property under the direct control of a court can be reached only through the authority of such court has been the law so long that it has become elementary. That the same rule governs when the claim against the property is for taxes is fully declared by the supreme court in Re Tyler, 149 U. S. 164–181, 13 Sup. Ct. 785, and cases therein cited. It results that the defendant should have had the consent of this court before proceeding against such lands, and any attempt to seize or sell them without such consent may be restrained.

The important question is whether any of the lands in question are now subject to state taxation. It will be conceded that lands belonging to the government cannot be so taxed, but that they can be when the legal or equitable title shall have passed from the government to some other party, and certainly it must follow that no one can be taxed therefor until such title shall be in him. In whom, therefore, does the title to these lands now rest? In reply to that much has been said of the holdings of courts that the grant was one in praesenti, but such grants become operative from the date of the act, only after the conditions attached are fully complied with. It was by no means an absolute grant of all the land in each odd section within the place limits, for there were excepted from its operation all rights existing, under any law of the United States prior to the "time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office" and all mineral lands. By many decisions it has been held, under the act in question and other similar acts, that as soon as the donee complied with the conditions of the act the equitable title, at least of all the odd sections, except those portions thereof to which prior rights had attached, passed to him, no reference being made to the mineral exception in the act. But it must be observed that many of such decisions were concerning lands in those jurisdictions where no mineral existed; hence the mineral exception in the statute was not considered. By another line of authorities it was held that mineral lands not actually known to be such at the time the grant became operative passed with the other lands to the donee. Such was the view held by that able jurist the late circuit judge of this circuit, in Railroad Co. v. Barden, 46 Fed. 592; and such was the generally recognized rule until the reversal of that case by the supreme court in 154 U. S. 288, 14 Sup. Ct. 1030. Undoubtedly, under such construction of the act the complainants would have an equitable title to these lands, and they would be subject to taxation; but this recent decision has overturned that construction. Has it not also overturned, or at least put in abeyance, complainants' title to all these lands, and placed them beyond the reach of state taxation? The court, in substance, says, in the Barden Case, that no title to any mineral lands, whether known or unknown as mineral,

passes until a patent shall issue; that it is the duty of the land department to investigate the facts, and to withhold patent to all it shall conclude are mineral. The conclusive effect of this decision is that the complainants have now no title to any of these lands; they have no actual control over or use of any; they cannot sell or give title to any; and whatever right or claim they may have is now so fully suspended that they cannot allege any present title. Beyond question, to some of them they will procure title; but to which they do not now know. Some of them are so clearly nonmineral that none can doubt their character; yet it is not complainants' right to determine or act upon that; but, prior to the act of congress of February 26, 1895, it was alone for the department to determine. The supreme court has held that before lands can be taxed the equitable title must have so far passed to the party that nothing more remains to be done but the mere formal act of issuing the patent to him, and, as held in Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496–505, 10 Sup. Ct. 341, the lands alienated must be distinctly defined, the donee must have the right to the lands, and not be excluded from their enjoyment. This was a case in which the state undertook to tax lands within the indemnity limits claimed by the railroad company in lieu of lands within the place limits which had been otherwise disposed of. The lands being in an agricultural country, the mineral exception in the law was not in question. The court held that all lands in the odd sections within the place limits not previously granted belonged to the railroad company, and could be taxed, but that as to those claimed within the indemnity limits no title passed until the selections made by the railroad had been approved by the secretary of the interior; that, although the company had done all required of it, and was demanding its patents, the secretary had refused to grant them; that his duties requiring him to investigate certain facts were judicial, and not merely ministerial; and that, until he did determine and act, the lands remained the property of the United States; that, while the government had made its promise to convey the lieu lands, yet such promise passed no title or created any legal interest until the department of the interior had performed the required acts; and it concluded that none of the lands claimed by the railroad company within the indemnity limits were subject to taxation. The facts of that case make the principle therein announced applicable to the facts in this case. Here, the mineral lands are excepted from the grant; the railroad has claimed all the lands within the odd sections, has done all by the law required to entitle it to patents, which it has demanded, and which the government has denied, for the reason that some of the lands claimed may be mineral, and says it must first investigate the facts, and that when it shall determine which of the lands are nonmineral it will issue its patent accordingly. This is a judicial question also, and until it is determined the complainants will have no title of any kind to any of the lands in controversy, which must lead us to the conclusion that none of them can now be subject to taxation. If, however, the decision in the Barden Case leaves any doubt that all title of the railroad company is so in abeyance

that it can exercise no control over or make any use or absolute dis-
position of any of these lands, it is entirely removed by the late act
of congress approved February 26, 1895, by which it is provided that
the secretary of the interior shall "cause all lands within the land
districts hereinafter named [within which lie these lands] in the
states of Montana and Idaho within the land grant and indemnity
land grant limits of the Northern Pacific Railroad Company * * *
to be examined and classified * * * with special reference to
the mineral or nonmineral character of such lands and to reject, can-
cel and disallow any and all claim or filings heretofore made or which
may hereafter be made by or on behalf of said Northern Pacific Rail-
road Company on any lands in said land districts. * * * And
provided further, that the examination and classification of lands
hereby authorized shall be made without reference or regard to any
previous examination or report or classification thereof. That no
patent or other evidence of title shall be issued or delivered to said
Northern Pacific Railroad Company, for any lands in said land dis-
tricts until such lands shall have been examined and classified as
nonmineral, as provided for in this act, and such patent or other
evidence of title shall only issue then to such land, if any, in said
land districts as said company may be, by law and compliance there-
with and by said classification entitled to, and any patent, certifi-
cate or record of selection or other evidence of title or right to pos-
session of any land in said land districts, issued, entered or delivered
to said Northern Pacific Railroad Company in violation of the pro-
visions of this act shall be void: provided, that nothing contained
in this act shall be taken or construed as recognizing or confirming
any grant of land or the right to any land in the said Northern
Pacific Railroad Company, or as waiving or in any wise affecting
any right on the part of the United States against said Northern
Pacific Railroad Company to claim a forfeiture of any land grant
heretofore made to said company." Not only have we here the clear
statement that the railroad company has no present title of any
kind, and cannot have, until after the examination and classification
provided for, to any of these lands within the place or indemnity lim-
its, but it is so repeated in different forms in the act that no doubt
of the design of congress can be entertained. If the company has
no present title, it must follow that it remains in the government,
and that the state cannot exercise the power of taxation. It is
urged, and not without logic, that if the company now has no title
to these lands it is not concerned in their taxation, and should not
be heard to object thereto, and that if the lands belong to the com-
pany it cannot object. The injustice and hardship of this view is
that, as must be conceded, some of these lands will be held by the
government as mineral lands, and as it cannot now be determined
which will be so found, the company, to avoid all risk of doubt upon
the title to those which may be finally awarded to it, must pay upon
all, and trust to future repayment of taxes erroneously paid.
It may also be said that if the company now has no such title or
claim to the lands as will justify their taxation, the threatened sale
will cast no cloud. This leaves the company to assume all the risk,

leads to unnecessary expense on the part of the state, and to possible clouding of the title of the lands, and not only to such uncertainty of title as may for years prevent their occupation and improvement, but may result in a multiplicity of suits. While the courts favor the collection of taxes as a burden in which all should bear their just part, there is not sufficient reason why it should force this company to submit to an injustice in order to protect its rights. When the government so withdraws its claim to, and so ceases to exercise jurisdiction and control over, these lands, that it may fairly be said the company has at least an equitable title to any distinct tracts or parcels thereof, the same may be taxed, and should not be before.

The objection that this tax cannot be stayed by injunction is answered by the railroad land-tax case, 133 U. S., 10 Sup. Ct. It is therefore ordered that the demurrer be overruled, and that this order operate to continue the existing restraining order.